# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| STATE OF OKLAHOMA, et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | No. 12-9526 |
| | ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| OKLAHOMA GAS & ELECTRIC COMPANY, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | No. 12-9527 |
| v. | ) | |
| | ) | |
| UNITES STATES ENVIRONMENTAL PROTECTION AGENCY, and Lisa P. Jackson, Administrator, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) | |
| | ) | |
| Respondents | ) | |

An Original Action in the Court of Appeals, challenging
a Federal Rule found at 76 Fed. Reg. 81,728 (Dec. 28, 2011)

_____

## MOTION TO INTERVENE BY SIERRA CLUB
_____

The Sierra Club respectfully moves to intervene in support of respondent U.S. Environmental Protection Agency ("EPA") in the above-captioned case challenging EPA's Clean Air Act regulations implementing a regional haze plan for Oklahoma. Counsel for the Public Service Company of Oklahoma ("PSO") and Oklahoma Gas & Electric ("OG&E") have stated that those petitioners do not oppose this motion. Counsel for the State of Oklahoma and EPA have indicated that those parties take no position on the motion.

## Introduction

On December 28, 2011, EPA issued a final rule implementing the Clean Air Act requirements for regional haze in the State of Oklahoma. *Approval and Promulgation of Implementation Plans; Oklahoma; Federal Implementation Plan for Interstate Transport of Pollution Affecting Visibility and Best Available Retrofit Technology Determinations*, 76 Fed. Reg. 81,728 (Dec. 28, 2011) ("EPA's Plan" or "EPA's Regional Haze Plan"). EPA's Regional Haze Plan for Oklahoma requires six coal-fired boilers at three power plants to limit haze-forming sulfur dioxide emissions. *Id.* at 81,729. The plants can achieve

1

these emission limits by installing pollution controls known as scrubbers or by switching the units to burn natural gas instead of coal. *Id*. On February 24, 2012, the State of Oklahoma and two electric utility companies that operate the affected coal plants, PSO and OG&E, filed separate petitions for review of that rule in this Court. *PSO v. EPA*, No. 12-9525; *State of Oklahoma v. EPA*, No. 12-9526; and *OG&E v. EPA*, No. 12-9527. The State of Oklahoma and OG&E moved to consolidate their petitions and the Court granted that motion on March 21, 2012. Order dated Mar. 21, 2012, Nos. 12-9526 and 12-9527. Sierra Club now moves to intervene in the consolidated case and moves in a separate motion to intervene in case No. 12-9525 filed by PSO.

Sierra Club, a national nonprofit conservation organization with local members that care deeply about protecting public health and air quality, has been intimately involved in every step of the administrative and judicial proceedings leading to EPA's Regional Haze Plan. The three Oklahoma coal-fired power plants at issue emit substantial amounts of pollution that directly harms Sierra Club and its individual

members. Petitioners' success in delaying or reversing EPA's Plan[1]
would result in greater pollution from Oklahoma's coal-fired power
plants, harming public health and impairing visibility, while negating
the substantial effort and resources Sierra Club has devoted to support
EPA's Plan. EPA does not adequately represent the interests of Sierra
Club's local members or its organizational interests. The government is
obligated to consider a broader array of interests than those of the
Sierra Club; indeed, Sierra Club advocated for more environmental
protections than EPA included in its final Plan. *See Utah Ass'n of
Counties v. Clinton*, 255 F.3d 1246, 1256 (10th Cir. 2001). This motion
is timely filed within 30 days of the petitions. Sierra Club therefore
meets the requirements of Federal Rule of Appellate Procedure 15(d)
and Tenth Circuit Rule 15.2(B) and this motion should be granted.

---

[1] *See* Comments on EPA's proposed rule separately submitted by
Oklahoma Attorney General, OG&E, and PSO, in Docket No. EPA-R06-
OAR-2010-0190 (May 23, 2011),
http://www.regulations.gov/#!documentDetail;D=EPA-R06-OAR-2010-
0190-0040 (Oklahoma Attorney General);
http://www.regulations.gov/#!documentDetail;D=EPA-R06-OAR-2010-
0190-0038 (OG&E);
http://www.regulations.gov/#!documentDetail;D=EPA-R06-OAR-2010-
0190-0052 (PSO).

## Background

### A. The Clean Air Act's Regional Haze Requirements

Air pollution degrades visibility in many of America's most treasured scenic areas, including Oklahoma's beloved Wichita Mountains. In order to protect the nation's "intrinsic beauty and historical and archaeological treasures," H.R. Rep. No. 95-294, at 203-04 (1977), Congress established the Clean Air Act's Regional Haze requirements, intended to reduce pollution and achieve natural visibility conditions at national parks, wilderness areas, and other designated "Class I" areas, including the Wichita Mountains.  42 U.S.C. § 7491(a)(1); 40 C.F.R. § 51.308(d)(1) (2012).  The Act's Regional Haze provisions require states – or, where necessary, EPA – to adopt and implement a regulatory plan that will reduce, and ultimately eliminate, man-made haze from air pollution sources that may contribute to visibility impairment at any protected Class I area.  *Id*.

The same pollutants that cause visibility impairment also harm public health.  For example, sulfur dioxide increases asthma symptoms, leads to increased hospital visits, and can form particulate matter that aggravates respiratory and heart diseases and causes premature

death.[2]  Reducing haze pollution therefore has public health benefits.

EPA estimated that in 2015, full implementation of the Regional Haze

program nationally will prevent "1,600 premature deaths, 2,200 non-

fatal heart attacks, 960 hospital admissions, and over one million lost

school and work days."[3]

### B. History of Oklahoma's Regional Haze Plan

Oklahoma failed to submit a regional haze plan to EPA by the

2007 statutory deadline, and EPA published an official finding to that

effect in 2009. *See Finding of Failure to Submit State Implementation*

*Plans Required by the 1999 Regional Haze Rule*, 74 Fed. Reg. 2392 (Jan.

15, 2009). Over a year later, on February 19, 2010 – three years after

the original deadline – Oklahoma finally submitted a regional haze plan

to EPA. *See Approval and Promulgation of Implementation Plans;*

*Oklahoma; Regional Haze State Implementation Plan; Federal*

*Implementation Plan for Interstate Transport of Pollution Affecting*

---

[2] EPA, *Health – Sulfur Dioxide* (2011),
http://www.epa.gov/air/sulfurdioxide/health.html.
[3] EPA, *Fact Sheet - Final Amendments to the Regional Haze Rule and Guidelines for Best Available Retrofit Technology (BART) Determinations* (2011), http://www.epa.gov/visibility/fs_2005_6_15.html.

*Visibility and Best Available Retrofit Technology Determinations*, 76 Fed. Reg. 16,168 (proposed Mar. 22, 2011).

Oklahoma's proposal, however, failed to meet the Clean Air Act's requirements. In particular, Oklahoma's plan failed to adequately address sulfur dioxide emissions from coal-fired power plants that contribute to haze in national parks and wilderness areas (including the Wichita Mountains National Wildlife Refuge in Oklahoma, Caney Creek and Upper Buffalo Wilderness Areas in Arkansas, and the Hercules Glades Wilderness Area in Missouri). Oklahoma's plan would have allowed sulfur dioxide pollution from those plants well above the statutory minimum; indeed, Oklahoma's plan proposed "limits" that exceeded the current sulfur dioxide emissions from most of the plants' units. *See* 76 Fed. Reg. at 16,182-7. When a state plan fails to meet statutory requirements, the Clean Air Act requires EPA to provide a federal plan. 42 U.S.C. § 7410(c). Accordingly, on March 22, 2011, EPA proposed to approve in part and disapprove in part Oklahoma's plan, and EPA also proposed a federal plan that would replace the inadequate provisions in Oklahoma's plan addressing sulfur dioxide emissions. *Id.*

Arguing that EPA did not have authority to issue the proposed federal plan, Oklahoma sued EPA in federal court in the Western District of Oklahoma. *State of Oklahoma ex rel. Pruitt v. Lisa Jackson*, No. CIV-11-0605-F (W.D. Okla. filed May 31, 2011).  Sierra Club intervened in that case as a defendant, and PSO and OG&E intervened as plaintiffs. *Id.* After EPA issued the final rule on December 27, 2011, that case was dismissed as moot.  *Id.* at Order dated Jan. 5, 2012.

## C. EPA's Regional Haze Plan Will Reduce Pollution from Three Oklahoma Coal Plants, Improving Visibility and Air Quality

On December 28, 2011, EPA finalized the proposed Regional Haze plan for Oklahoma ("EPA's Plan" or "EPA's Regional Haze Plan"). 76 Fed. Reg. 81,728. EPA's Plan affects three coal-fired power plants: OG&E's Muskogee and Sooner plants and PSO's Northeastern plant. Because these thirty-year old plants lack modern pollution controls, they emit millions of tons of harmful and haze-forming pollution every year.  According to recent EPA data, the combined emissions of these plants totaled over 64,000 tons of sulfur dioxide, 41,500 tons of nitrogen

oxides, and 619 pounds of mercury a year.[4]  Sierra Club members and

their families are directly and adversely impacted by these harmful

emissions.  *See* Declarations of Christopher Applegate ("Applegate

Decl.") (Exhibit A); Toni Armstrong ("Armstrong Decl.") (Exhibit B);

Richard Spener ("Spener Decl.") (Exhibit C); Maggie Bailey ("Bailey

Decl.") (Exhibit D).

EPA's Plan requires stricter control of sulfur dioxide emissions

from the three coal plants than Oklahoma's suggested plan. Oklahoma

proposed a sulfur dioxide emission limit of 0.6 lbs/mmbtu, which the

plants could achieve without installing state-of-the-art pollution

controls.  In contrast, EPA's Plan contains a much lower sulfur dioxide

emissions limit (0.06 lbs/mmbtu) that will require the plants to install a

pollution control device known as a dry scrubber; alternatively, the coal

plants can convert the units to burn natural gas. 76 Fed. Reg. at 81,729.

The State of Oklahoma and the affected utilities have publicly criticized

---

[4] EPA, Quarterly Emissions Tracking,
http://www.epa.gov/airmarket/images/CoalUnitCharacteristics2011.xls
(SO2 and NOx emissions); EPA, Toxics Release Inventory (TRI)
Program Release Reports,
http://iaspub.epa.gov/triexplorer/tri_release.facility (mercury
emissions).

EPA's Plan because they do not wish to bear the cost of adding

scrubbers or converting the plants to burn natural gas.[5]


## Argument

The Tenth Circuit follows "a somewhat liberal line in allowing

intervention." *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1249

(10th Cir. 2001) (citation omitted). An aspiring intervenor must state

its interest in the case and explain why the existing parties cannot

adequately represent those interests. Fed. R. App. P. 15(d); 10th Cir. R.

15.2(B)(1). As explained below, Sierra Club satisfies these

requirements because it has aesthetic, recreational, public health, and

organizational interests that are not adequately represented by EPA.

The Tenth Circuit recently recognized Sierra Club met these

requirements by granting it intervention in a very similar case filed by

New Mexico challenging EPA's regional haze plan for that state. Order

dated Nov. 18, 2011, *Martinez v. EPA*, No. 11-9567 (10th Cir. filed Oct.

---

[5] *See, e.g.*, E. Scott Pruitt, *Attorney General Pruitt Sues EPA Over Regional Haze Rule*, Jun. 1, 2011, http://www.oag.state.ok.us/oagweb.nsf/0/1B875A0A1B56FAF2862578A2005C0B16.

21, 2011). The Western District of Oklahoma Court also recently granted Sierra Club intervention in an action where Oklahoma sued EPA regarding EPA's proposed regional haze plan. *State of Oklahoma ex rel. Pruitt v. Lisa Jackson*, No. CIV-11-0605-F (W.D. Okla. filed May 31, 2011).

### A. Sierra Club Has a Substantial Interest in Reducing Regional Haze That Will Be Harmed if Petitioners Prevail

Sierra Club and its members have a substantial interest in defending EPA's Plan that will be impaired if the Plan's implementation is reversed or delayed. A potential intervenor must claim an interest that "could be adversely affected by the litigation," but "practical judgment," and not a "rigid formula," must be applied. *San Juan County v. United States*, 503 F.3d 1163, 1199 (10th Cir. 2007) (en banc) (finding "indisputable that [conservation organization's] environmental concern is a legally protectable interest."). "If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." *Id.* at 1195 (citation omitted). An aspiring intervenor must also show that, "as a practical matter," their ability to

protect their interest may be impaired or impeded. *Coal. of Arizona/New Mexico Counties for Stable Econ. Growth v. Dep't of the Interior*, 100 F.3d 837, 844 (10th Cir. 1996). The "impairment" element "presents a minimal burden." *WildEarth Guardians v. Nat'l Park Serv.*, 604 F.3d 1192, 1199 (10th Cir. 2010).

### 1. Pollution from Oklahoma's Coal Plants Adversely Impacts Sierra Club Members

Sierra Club, founded in 1892, is a national nonprofit environmental organization with 1.4 million members and supporters nationwide, including Oklahoma, Arkansas, and Missouri.[6]  Emissions from Oklahoma's coal plants impacts air quality in the State as well as Arkansas and Missouri. *See* 76 Fed. Reg. at 81,729.  Sierra Club members living and recreating in these states are directly and adversely impacted by pollution from Oklahoma's coal plants.  Sierra Club's national Beyond Coal Campaign is a major effort to promote clean air and to protect communities and natural environments threatened by dangerous pollution from coal-fired power plants.[7]  One

---

[6] Sierra Club, www.sierraclub.org/welcome.
[7] *See* Sierra Club, Beyond Coal Campaign, www.beyondcoal.org.

of the Campaign's core interests is in the implementation and
enforcement of federal regulations governing air pollution.[8]

Sierra Club members who live and recreate in Oklahoma,
Arkansas, and Missouri have aesthetic, recreational, and health
interests related to the region's air quality.  The pollution which EPA's
Regional Haze Plan would eliminate degrades visibility in national
parks and wilderness areas, including the Wichita Mountains National
Wildlife Refuge in Oklahoma, Caney Creek and Upper Buffalo
Wilderness Areas in Arkansas, and the Hercules Glades Wilderness
Area in Missouri. *See* 76 Fed. Reg. at 81,729. Sierra Club members are
avid outdoors enthusiasts who lead trips to these wilderness areas with
their families and friends, other Sierra Club members and supporters,
schoolchildren, and university students.  *See* Applegate Decl. ¶5; Spener
Decl. ¶4; Armstrong Decl. ¶4; Bailey Dec. ¶4. They are all troubled by
the lack of clear scenic vistas and fresh air, and the pollution prevents
them from fully enjoying their home environs and recreational
activities. *See* Spener Decl. ¶8; Applegate Decl. ¶6; Armstrong Decl. ¶8;
Bailey Decl. ¶6. EPA's Plan will reduce harmful pollution and improve

[8] *Id.*

the scenic views at these four national parks and wilderness areas. 76 Fed. Reg. at 81,729.

Since Sierra Club members spend a great deal of time outdoors, and some live dangerously close to Oklahoma's coal plants, they also have grave concerns about how the degraded air quality affects their health and the health of their families and friends. *See* Applegate Decl. ¶5; Armstrong Decl. ¶4; Bailey Decl. ¶5. Some members have asthma, which increases their risk of harm from poor air quality and forces them to limit the time they spend outdoors. *See* Spener Decl. ¶7. Other members are concerned about how haze presents a health risk to children who they chaperone in wilderness trips. One member who leads wilderness trips in Arkansas for schoolchildren has noticed an increasing number of the kids carry inhalers to treat their asthma. Bailey Decl. ¶5.

If petitioners prevail in the present case, Sierra Club members and their loved ones will be harmed because Oklahoma's coal plants will not be required to reduce emissions of haze-causing pollutants. *E.g.,* Applegate Decl. ¶15. Members are concerned haze problems will worsen if Oklahoma coal plants continue to emit high levels of

pollutants. *E.g.,* Applegate Decl. ¶10; Bailey ¶7. They are also

concerned that less people will visit the wilderness areas as a result of

the pollution and visibility problems, and that future generations will

not be able to fully experience the splendor of pristine views. *Id.*

### 2. Sierra Club's Organizational Interest in EPA's Plan

Sierra Club has advanced its organizational interests and the

interests of its members by investing significant resources in every step

of the administrative and judicial proceedings leading to EPA's

Regional Haze Plan for Oklahoma. Sierra Club submitted comments

both to the State regarding its proposed plan, and to EPA on its

proposed plan. Those comments stressed the importance of reducing

harmful, haze-forming emissions, and the feasibility of using cleaner

and cheaper alternatives to achieve emissions reductions.[9]  In addition

to those detailed legal and technical comments, Sierra Club sponsored a

comment campaign that prompted 51 people to submit comments to

---

[9] *See* Oklahoma Chapter of the Sierra Club, *Comments Regarding Oklahoma Draft Regional Haze State Implementation Plan*, Dec. 13, 2009 (Exhibit E); Sierra Club and WildEarth Guardians, *Final Oklahoma Haze FIP Comments,* May 23, 2011 (Exhibit F).

EPA on its proposed plan,[10] and several members spoke at EPA's public hearings in Tulsa and Oklahoma City.[11,12] *See* Applegate Decl. ¶12.

Sierra Club has also been participating in related administrative proceedings at the Oklahoma Corporation Commission, the state body that governs electric utilities.[13] And Sierra Club intervened in a prior federal court action where Oklahoma sued EPA regarding the proposed regional haze plan. *State of Oklahoma ex rel. Pruitt v. Lisa Jackson*, No. CIV-11-0605-F (W.D. Okla. filed May 31, 2011) (dismissed as moot after EPA issued final plan).

---

[10] *See Mass Comment Campaign sponsored by Oklahoma Chapter Sierra Club, e-mail (5) and paper (46)*, http://www.regulations.gov/#!documentDetail;D=EPA-R06-OAR-2010-0190-0055.

[11] *See Public Hearing Transcript and Exhibits, Oklahoma City, April 13, 2011*, pps. 2-3 (listing speakers) http://www.regulations.gov/#!documentDetail;D=EPA-R06-OAR-2010-0190-0031.

[12] *See Public Hearing Transcript and Exhibits, Tulsa, Oklahoma, April 14, 2011*, pps. 2-3 (listing speakers) http://www.regulations.gov/#!documentDetail;D=EPA-R06-OAR-2010-0190-0032.

[13] *See, e.g.*, *Inquiry of the Oklahoma Corporation Commission to Examine Current and Pending Federal Regulations and Legislation Impacting Regulated Utilities in the State of Oklahoma and the Potential Impact of Such Regulations on Natural Gas Commodity Markets and Availability in Oklahoma*, Cause No. PUD 201100077, Oklahoma Corporation Commission (filed Jun. 15, 2011), http://www.occeweb.com/pu/EPA/2011-077%20NOI.pdf

More generally, Sierra Club has worked from the inception of the Clean Air Act to strengthen and implement its provisions, including those that address environmental and public health impacts that result from burning coal. *See, e.g., Sierra Club v. EPA*, 344 F.Supp. 253 (D.C. Cir. 1972).  In addition to advocacy at local and national levels, Sierra Club has pursued litigation strategies to advance members' interest in clean and clear air. *See e.g. Arizona Pub. Serv. Co. v. EPA*, 562 F.3d 1116 (10th Cir. 2009) (Sierra Club challenge of federal regional haze plan for Four Corners coal-fired power plant). Sierra Club's request for intervention in this case is a continuation of decades of such efforts.

Given these significant interests and the risk of impairment, Sierra Club has fulfilled the interest requirement under Federal Rule of Appellate Procedure 15(d).[14]

---

[14] Sierra Club has also established its standing to sue, though the Tenth Circuit has recognized that proposed intervenors are not required to make this demonstration.  *See San Juan County*, 503 F.3d 1163, 1167, 1200 (10th Cir. 2007) (en banc).  As the Court recognized in that case, the interest standard for intervention is less rigorous than for standing to sue. *Id.* at 1193-97.

## B. EPA Cannot Adequately Represent Sierra Club's Interest

Sierra Club's interests are not adequately represented by EPA – as the Tenth Circuit recently recognized by granting Sierra Club intervention in a similar case the state of New Mexico filed challenging EPA's regional haze plan for the coal-fired San Juan Generating Station. Order dated Nov. 18, 2011, *Martinez v. EPA*, No. 11-9567 (10th Cir. Oct. 21, 2011). Sierra Club is a non-profit membership organization focused on improving and protecting the environment, and it has local members who are directly affected by EPA's Regional Haze Plan. As a result of that narrow focus on reducing pollution, the Sierra Club has often taken positions regarding the Clean Air Act contrary to those of EPA. *See, e.g. Arizona Pub. Serv. Co. v. EPA*, 562 F.3d 1116 (10th Cir. 2009) (Sierra Club's challenge of EPA's regional haze plan for Four Corners coal-fired power plant).

EPA does not adequately represent the particular local interests of Sierra Club in this case because, *inter alia,* "[i]n litigating on behalf of the general public, the government is obligated to consider a broad spectrum of views, many of which may conflict with the particular interest of the would-be intervenor." *Utah Ass'n of Counties*, 255 F.3d

1246, 1256 (10th Cir. 2001); *Wildearth Guardians, v. Nat'l Park Serv.*,
604 F.3d 1192, 1200 (10th Cir. 2010) (inadequate representation
element presents a "minimal burden").  Although EPA and Sierra Club
may share some objectives, the government has multiple objectives
outside of Sierra Club's interests. *See Utah Ass'n of Counties*, 255 F.3d
at 1254-6; *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 997
(10th Cir. 2009) (Even though mine owner and the Forest Service
shared the same litigation objective, "the government has multiple
objectives and could well decide to embrace some of the [petitioner's]
goals."); *Cf. San Juan County*, 503 F.3d 1163, 1206 (10th Cir. 2007) (en
banc) (rejecting intervention because the groups failed to provide any
reason to believe they would have different arguments than the
government).

Unlike EPA, Sierra Club members have personal stakes in EPA's
Regional Haze Plan for Oklahoma.  As a federal agency, EPA's view on
regulating air pollution in Oklahoma is not necessarily the same as that
of local Sierra Club members who actually breathe polluted air.
Members live and recreate within the region and they are directly and
adversely impacted by pollution from Oklahoma's coal plants, as

described in detail above. *See* Applegate, Armstrong, Spener, and Bailey Decls.

As a consequence of these differences, Sierra Club sought stronger protections than EPA provided in the final rule. For example, Sierra Club commented that EPA's proposed plan should be more stringent by requiring limits for ammonia and sulfuric acid mist.[15] Sierra Club has, moreover, emphasized the economic and environmental benefits of replacing the outdated plants through increased renewable energy production, energy efficiency, and demand response programs.[16] EPA, in contrast, has expressed no interest in whether the plants install controls, retire, or re-power with natural gas.

---

[15] Sierra Club and WildEarth Guardians, *Final Oklahoma Haze FIP Comments,* May 23, 2011, Ex. F at 30.

[16] *Id.* at 17; *See, e.g., Inquiry of the Oklahoma Corporation Commission to Examine Current and Pending Federal Regulations and Legislation Impacting Regulated Utilities in the State of Oklahoma and the Potential Impact of Such Regulations on Natural Gas Commodity Markets and Availability in Oklahoma*, Cause No. PUD 201100077, Oklahoma Corporation Commission (filed Jun. 15, 2011), http://www.occeweb.com/pu/EPA/2011-077%20NOI.pdf.

## Conclusion

As set out above, Sierra Club has demonstrated a strong interest in EPA's Regional Haze Plan for Oklahoma that may be impaired in its absence, and EPA does not adequately represent Sierra Club's interest. *See* Fed. R. App. P. 15(d); 10th Cir. R 15.2(B)(1). Sierra Club therefore respectfully requests the Court grant its motion to intervene in this action.

Respectfully submitted March 26, 2012.

<u>      s/Andrea Issod      </u>

Andrea Issod
Elena Saxonhouse
Sanjay Narayan
Sierra Club
85 Second Street, Second Floor
San Francisco, CA 94105-3441
415.977.5544 phone
415.977.5793 fax
andrea.issod@sierraclub.org
elena.saxonhouse@sierraclub.org
sanjay.narayan@sierraclub.org

20

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, Sierra Club

states that it has no parent corporations or entities.  Because Sierra

Club is not a publicly-traded corporation or an entity that has issued

stock, no publicly held corporation or entity owns ten percent or more of

any of Sierra Club's stock.

<u>s/ Andrea Issod</u>
Andrea Issod

## CERTIFICATE OF DIGITAL SUBMISSION
## AND PRIVACY REDACTIONS

The undersigned certifies that:

(1) All required privacy redactions have been made; and

(2) This digital submission was scanned for viruses with Symantec

Endpoint Protection v11.0.6100.645, which was last updated on March

25, 2012. According to this program, this submission is free of viruses.

<u>s/ Andrea Issod</u>
Andrea Issod

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of March, 2012, a copy of this

Motion to Intervene by Sierra Club was served electronically on all

parties to this matter, through the Court's CM/ECF system.

s/ Andrea Issod
Andrea Issod

# EXHIBIT A

## DECLARATION OF CHRISTOPHER D. APPLEGATE

1. My name is Christopher D. Applegate, and I am of legal age and competent to give this declaration. All information herein is based on my own personal knowledge unless otherwise indicated.

2. I live in Norman, Oklahoma, and have been a resident since August 2008.

3. I am an active member of the Sierra Club, and have been a member since February of 2011.  In January 2011, I assumed the role of vice chair and outings leader for the Red Earth Group of the Sierra Club's Oklahoma Chapter, which meets in Norman. In January 2012, I assumed the role of membership chair and fundraising chair for the Oklahoma Chapter as well.

4. The Oklahoma chapter of the Sierra Club has over 3,000 members, and working for a coal free Oklahoma is one of its main campaigns.  Sierra Club's national Beyond Coal Campaign is a major effort to promote clean air and to protect communities and natural environments threatened by dangerous pollution from coal-fired power plants.

5. The Wichita Mountains are a beloved and very special place for me that I visit frequently.  As the outings leader of the Red Earth Group, I help organize and lead outings to Oklahoma's great outdoors, including the

1

Wichita Mountains.  I am also working with the Red Earth Group to develop a more robust community outreach program that aims to provide more community members with opportunities to explore the outdoors while educating the public about pertinent environmental issues, such as air and water pollution.  I have already led two trips this year to the Wichita Mountains and am planning a third with students from the University of Oklahoma. I also enjoy hiking in my free time, and have returned to the Wichita Mountains with family and friends five or six times this year since my last organized trip. My last visit was two weeks ago.

6. During my trips to the Wichita Mountains, I have been troubled by seeing haze pollution. Visibility from the Wichita Mountains is greatly impaired. I am saddened by the lack of visibility and concerned about its impact on my health and others around me, and it reduces my enjoyment of the area.

7. I understand that regional haze caused by coal-fired power plants in Oklahoma degrades the visibility at the Wichita Mountains National Wildlife Refuge in Oklahoma as well as other wilderness areas in surrounding states. I share the Sierra Club's strong interest in protecting these areas from the ills of haze pollution.

8. I understand that haze-causing pollutants, such as sulfur dioxide and particulate matter, pose a serious threat to public health. According to EPA, sulfur dioxide increases asthma symptoms, leads to increased hospital visits, and can form particulate matter that aggravate respiratory and heart diseases and cause premature death.[1]

9. I plan to live in Oklahoma permanently, and I am concerned about the impacts of haze pollution on my health, and the health of my family and friends.

10. I already refrain from exploring other parts of Oklahoma with higher concentrations of coal-fired power plants, mainly in eastern Oklahoma; such as Natural Falls State Park, Grand Lake, and the Ouachita Mountains in southwest Oklahoma, as I am concerned about air pollution in those areas. I am concerned that visibility and air quality will worsen near my home, and that less people will visit the Wichita Mountains as a result of the visibility problems.

11. I understand that in December 2011, the U.S. Environmental Protection Agency (EPA) published the final federal regional haze plan for Oklahoma, which requires significant reductions of sulfur dioxide emissions at six coal-fired units in Oklahoma.  I understand that EPA's

---

[1] EPA, Health – Sulfur Dioxide, http://www.epa.gov/air/sulfurdioxide/health.html (last visited July 7, 2011).

3

regional haze plan for Oklahoma will reduce sulfur dioxide pollution and regional haze more significantly than the state's proposal. EPA's plan gives big polluters a choice: install new scrubber technology to limit emissions or retire their coal plants and convert to cleaner energy sources. This is a big step towards stopping the pollution that is harming our communities and getting off coal entirely by transitioning to cheaper, cleaner energy alternatives like wind, solar, and natural gas.

12. I strongly support EPA's efforts to reduce haze pollution in Oklahoma. Sierra Club sponsored a comment campaign that prompted fifty-one other people to submit comments to EPA, and several members spoke at EPA's public hearings in Tulsa and Oklahoma City, including myself. Sierra Club filed also filed detailed technical comments on EPA's Regional Haze rulemakings and related Corporation Commission (Oklahoma's utility commission) actions at every stage in the process.

13. In April 2011, I spoke at a public hearing in Midwest City on EPA's proposed plan to reduce regional haze. At the hearing, I expressed concerns about the impacts of haze pollution on visibility in my beloved Wichita Mountains. I also expressed concerns about the public health impacts of haze pollution. I also contacted other Sierra Club members before the public hearing to encourage their attendance at the hearing and

help collect signatures on Sierra Club petitions asking both Oklahoma
electric utility companies to take steps to reduce their haze pollution.

14. The harm done to human health by pollutants from Oklahoma coal
plants carries heavy financial costs. Asthma attacks, heart attacks, premature
deaths, chronic bronchitis and hospital visits from pollution from the three
coal plants covered by the Oklahoma Haze FIP add up to over an estimated
$611 million a year in health care expenses that are passed on to the public,
according to the Clean Air Task Force.

http://www.catf.us/coal/problems/power_plants/existing/map.php?state=Okl
ahoma (last visited March 7, 2012).

15. I will benefit from the reductions in sulfur dioxide emissions in
EPA's regional haze FIP. The Oklahoma haze FIP will reduce emissions
of sulfur dioxide from six coal-fired units in Oklahoma, lessening the
impacts of haze pollution on the Wichita Mountains and improving the
scenic views there and helping to protect my health and the health of
my family and friends. I therefore want the Oklahoma haze FIP to go
swiftly into effect.  If the Oklahoma haze FIP is set aside or delayed,
however, I will be denied those benefits.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that all of the forgoing is true and correct.


_____
Christopher D. Applegate

# EXHIBIT B

## DECLARATION OF TONI ARMSTRONG

1. My name is Toni Armstrong, and I am of legal age and competent to give this declaration.

2. I live in St. Louis, Missouri. I have lived in St. Louis for over 35 years.

3. I am an active member of the Sierra Club, and have been a member since 1978.  I joined the Sierra Club because I believe in protecting the environment.

4. I enjoy spending my free time outdoors. I am an avid paddler and lead other Sierra Club members on paddling trips with my husband. My husband and I enjoy paddling on the rivers near us in St. Louis and around the state.

5. I live approximately 250 miles from the Hercules Glades Wilderness Area in Missouri. My husband and I went there last year for a camping and hiking trip and are planning to return this year.

6. I understand that regional haze caused by coal-fired power plants in Oklahoma affects the Hercules Glades Wilderness Area in Missouri as well as other Class I areas.  I have a strong interest in protecting these areas from

1

the harm caused by haze pollution and also protecting public health by improving air quality.

7. I understand that haze-causing pollutants, such as sulfur dioxide and particulate matter, also pose a serious threat to public health. My husband has asthma and I am concerned about the impacts of sulfur dioxide and particulate matter pollution on his health, as well as the health of other family members and my friends.

8. I am very concerned about the impacts of sulfur dioxide and particulate matter from coal-fired power plants to my health, my husband's health and the health of family and friends and on the scenic views at Hercules Glades Wilderness Areas.

9.  I understand that in December 2011, the U.S. Environmental Protection Agency (EPA) published the Federal Implementation Plan for Interstate Transport of Pollution Affecting Visibility and Best Available Retrofit Technology Determinations for Oklahoma ("Oklahoma Haze FIP"). It is my understanding that the Oklahoma Haze FIP requires reductions in sulfur dioxide emissions at six coal-fired units in Oklahoma, thereby lessening visibility impacts Hercules Glades Wilderness Areas and lessening public health impacts from sulfur

dioxide pollution.  I strongly support EPA's efforts to reduce haze pollution in Missouri.

10. According to the Clean Air Task Force, the harm done to human health by pollutants from Oklahoma coal plants carries a hefty price tag. Asthma attacks, heart attacks, premature deaths, chronic bronchitis and hospital visits from pollution from the three coal plants covered by the Oklahoma Haze FIP add up to over an estimated $611 million a year in health care expenses that are passed on to the public, according to the Clean Air Task Force's website.

http://www.catf.us/coal/problems/power_plants/existing/map.php?state=Oklahoma (last visited March 7, 2012).

11. If the Oklahoma Haze FIP is implemented, I will benefit from the reductions in sulfur dioxide emissions. The Oklahoma Haze FIP will reduce emissions of sulfur dioxide from six coal-fired units in Oklahoma, lessening the impacts of haze pollution on Hercules Glades Wilderness Areas and improving their scenic views and helping to protect my health and the health of my husband, family and friends. I therefore want the Oklahoma Haze FIP to go swiftly into effect.  If the Oklahoma Haze FIP is set aside or delayed, however, I will be denied those benefits.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that

all of the forgoing is true and correct.

_Toni Armstrong_ 3/19/12
Toni Armstrong

# EXHIBIT C

## DECLARATION OF RICHARD S. SPENER

1. My name is Richard S. Spener, and I am of legal age and competent to give this declaration.

2. I live in St. Louis, Missouri. I have lived in St. Louis for over 60 years.

3. I am an active member of the Sierra Club, and have been a member since 1996. I joined the Sierra Club because I believe in protecting the environment.

4. I enjoy spending my free time outdoors. My wife and I are avid paddlers. We enjoy paddling on the rivers near St. Louis and around the state and go approximately four times a month. Additionally, my wife and I both lead other Sierra Club members on paddling trips.

5. I live approximately 250 miles from the Hercules Glades Wilderness Area in Missouri and went there last year for a camping and hiking trip. I plan to return this year. Additionally, every couple of years, I enjoy paddling the Hailstone Run section of the Upper Buffalo River which runs through the Upper Buffalo Wilderness Area.

6. I understand that regional haze caused by coal-fired power plants in Oklahoma affects the Hercules Glades Wilderness Area in Missouri and the

1

Upper Buffalo Wilderness Area in Arkansas as well as other Class I areas. I

have a strong interest in protecting these areas from the ills of haze pollution

and also improving air quality to benefit public health.

7. I understand that haze-causing pollutants, such as sulfur dioxide

and particulate matter, also pose a serious threat to public health. I have

asthma and I am concerned about the impacts of sulfur dioxide and

particulate matter pollution on my health. In the past, I have had to limit my

time outdoors because of high levels of pollution near my home.

8. I am very concerned about the impacts of sulfur dioxide and

particulate matter from coal-fired power plants to my health and on the

scenic views at the Upper Buffalo and Hercules Glades Wilderness Areas.

9.  I understand that in December 2011, the U.S. Environmental

Protection Agency (EPA) published the Federal Implementation Plan for

Interstate Transport of Pollution Affecting Visibility and Best Available

Retrofit Technology Determinations for Oklahoma ("Oklahoma Haze

FIP"), which requires sulfur dioxide emissions at six coal-fired units in

Oklahoma to be reduced, thereby lessening visibility impacts at Upper

Buffalo and Hercules Glades Wilderness Areas and lessening public

health impacts from sulfur dioxide pollution.  I strongly support EPA's

efforts to reduce haze pollution in Missouri and Arkansas.

10. The harm done to human health by pollutants from Oklahoma coal plants carries heavy financial costs. Asthma attacks, heart attacks, premature deaths, chronic bronchitis and hospital visits from pollution from the three coal plants covered by the Oklahoma Haze FIP add up to over an estimated $611 million a year in health care expenses that are passed on to the public, according to the independent Clean Air Task Force. http://www.catf.us/coal/problems/power_plants/existing/map.php?state=Oklahoma (last visited March 7, 2012).

11. If the Oklahoma Haze FIP is implemented, I will benefit from the reductions in sulfur dioxide emissions. The Oklahoma Haze FIP will reduce emissions of sulfur dioxide from six coal-fired units in Oklahoma, lessening the impacts of haze pollution on the Upper Buffalo and Hercules Glades Wilderness Areas and improving their scenic views and helping to protect my health and the health of my family and friends. I therefore want the Oklahoma Haze FIP to go swiftly into effect.  If the Oklahoma Haze FIP is set aside or delayed, however, I will be denied those benefits.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that all of the forgoing is true and correct.

_____    3/19/12

Richard S. Spener

# EXHIBIT D

## DECLARATION OF MARGARET T. BAILEY

1. My name is Margaret T. Bailey, and I am of legal age and competent to give this declaration. All information herein is based on my own personal knowledge unless otherwise indicated.

2. I live in Ponca, Arkansas, in the Buffalo River National Park. I grew up on the headwaters of the Cossatot River, in the Caney Creek area. I call this area my childhood home and both of my parents still live in the area. Currently, my fiancé and I are helping my mother build a cabin on her land near the Caney Creek Wilderness.

3. I am an active member of the Sierra Club. I have worked for the Sierra Club and Audubon Arkansas to educate the local public about environmental issues. Specifically, I reached out to neighbors and concerned citizens to teach them about the local coal plants in Arkansas and Oklahoma and the negative environmental and health impacts that coal-fired power plants have on our wild areas and our community.

4. Most recently, I was the School Program Coordinator for the Ozark Natural Science Center (ONSC), an environmental education non-profit that takes youth on hiking and camping trips in the beautiful Ozark Plateau. I worked for ONSC for three years, coordinating and leading outdoor adventures for approximately 4,000 area students annually. My work

provided kids with the necessary opportunity to enjoy the great outdoors and explore nature. Most of these students come from Northwest Arkansas and neighboring states to the Ozarks, a place where they can get out of the cities and be outside.

5. As we were always aware of the medications that the students required, I have unfortunately noticed more and more inhalers to treat asthma.  I am concerned about air pollution in the region, especially as I witnessed more incidences of asthma among the students at the ONSC.   I am concerned that visibility and air quality will worsen, and that future generations of children will not be able to learn and grow in the areas where I now coordinate and lead camping trips for my occupation and for my family and friends.

6. My fiancé and I regularly enjoy hiking, fishing, canoeing, and kayaking on the Buffalo River. As the river is essentially right outside our door, we recreate in the area often. We chose to live in this area specifically to be in the country, away from the larger cities, in a place where we can easily spend a lot of time outside.  We are troubled sometimes by the visible line of haze while entering area cities, and concerned about the impact of poor air quality on our health.

7. I understand that regional haze caused by coal-fired power plants in Oklahoma affects the Upper Buffalo Wilderness Area in Arkansas as well as other areas. I have an interest in protecting these areas from haze pollution and improving air quality in the region so that students, teachers, and all people who spend time outdoors can do so without worrying about dirty air's negative impacts on their health.

8. I understand that pollution from coal plants pose a serious threat to public health. As a resident who intends to stay near the Buffalo River for some time and whose mother is planning to build a cabin near the Caney Creek Wilderness, I am concerned about the impacts of haze pollution on my health, and the health of my family and friends.

9. I strongly support EPA's regional haze plan for Oklahoma, which I understand will reduce pollution from coal plants.  My family and I will benefit from the reductions provided in EPA's plan, and we want the pollution reductions to take effect as soon as possible.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that all of the forgoing is true and correct.

/s/ _____
Margaret T. Bailey

# EXHIBIT E

# Oklahoma Chapter of the Sierra Club Comments Regarding Oklahoma Draft Regional Haze State Implementation Plan December 13, 2009

On October 5, 2009, the State of Oklahoma submitted its Draft State Implementation Plan (SIP) Revision for the Regional Haze Program, pursuant to 40 C.F.R. Part 51 et seq. As the local representative for the oldest and largest public interest environmental organization in the United States, the Oklahoma Chapter of the Sierra Club has reviewed the Oklahoma Draft SIP and offers the following comments regarding the adequacies of the SIP.

The leadership of the Oklahoma Chapter of the Sierra Club would like to recognize the diligent efforts put forth by the Oklahoma Department of Environmental Quality (ODEQ) in drafting its Regional Haze SIP.  Addressing air quality issues is a critical component to preservation of our nation's natural resources, public health, and citizen opportunities to enjoy our national parks, forests, and wildlife areas. Identifying the causes and nature of factors that influence air quality and visibility is an extremely complex and resource-intensive process; however, the ODEQ utilized its resources effectively in identifying both the causes and potential solutions to these issues in its SIP.  The Sierra Club appreciates the opportunity to comment on the revised SIP and looks forward to working with the ODEQ on identifying and implementing solutions to the aforementioned problems.

Collectively, the draft SIP effectively identifies the major causal factors for regional haze within the Class 1 area in Oklahoma, namely the Wichita Mountains Wildlife Refuge. The presentation of data regarding the Wichita Mountains is in depth; however, the draft SIP would be more effective in combating regional haze if it more thoroughly considered the impact of emissions from Oklahoma on Class 1 areas neighboring Oklahoma, namely Caney Creek and Upper Buffalo Wilderness Areas.  As demonstrated in tables VI-10 & VI-11, the impacts of required Best Available Retrofit Technology (BART) sources in Oklahoma are not limited to the Wichita Mountains Wildlife Refuge, but have a significant impact upon Caney Creek and Upper Buffalo Wilderness Areas. Therefore, the SIP and its BART analyses would present a more accurate impact upon regional haze if such an in-depth analyses were extended to the aforementioned areas in Arkansas.

Likewise, an important component to the revised SIP is ODEQ's consistent recognition of influential factors from jurisdictions outside of the State of Oklahoma. ODEQ cites in each discussion of particulates and chemical compounds impacting the Class 1 area within Oklahoma the overwhelming impact from point source emissions, area emissions, road and non-road vehicles, and burning that occur primarily in Texas and other jurisdictions.  Unlike the thorough explanation provided for Oklahoma based BART sources, non-BART sources, and solutions included in the impending Oklahoma Smoke

1

Management Program, the draft SIP offers little to no explanation of its efforts to address interstate impacts upon air quality and visibility in the Wichita Mountains.

The programs outlined in the draft SIP for addressing BART and BART exempt point source emissions have been thought through carefully, especially considering the constraints upon ODEQ's monitoring and enforcement capabilities. Acknowledging the impact of particulate transport from Texas, the SIP should offer an explanation of its efforts to address its impact on Oklahoma's Class 1 areas, beyond the impact of the Clean Air Interstate Rule Reductions.

In its sections addressing the impact of BART implementation through 2018 and its conclusive section on attaining maximum visibility standards, the ODEQ stipulates that all steps taken towards implementing BART controls within Oklahoma will have a limited impact upon visibility and regional haze, although compliant with the reasonable progress goals. Considering that between 8,000 and 11,000 Megawatts of new electric generation, largely from coal-fired sources, are either under construction or in the permitting process at the Texas Commission on Environmental Quality, the most significant potential impact Oklahoma can have upon regional haze is through addressing such development and its subsequent effect upon Oklahoma's Class 1 area. Therefore, it is imperative that Oklahoma's SIP include substantive discussions on addressing its role in regional impact mitigation both within and without the State of Oklahoma.

Regarding application of BART emission standards for qualifying facilities in Oklahoma, the Sierra Club applauds ODEQ's analysis provided in its SIP and included Appendices. While the Sierra Club ultimately supports the implementation of BART and Best Available Control Technologies (BACT) for the enhancement of air quality and prevention of significant deterioration, more analysis should be spent on approvable alternatives for BART-eligible sources to comply with Part 70 air quality permits and SIP provisions. Specifically, more analysis is necessary regarding potential fuel-switching from coal-fired steam facilities to natural gas powered facilities, and other portfolio diversification initiatives, such as adoption of renewable energy generation.

As one of the largest contributors to regional haze and air quality degradation, electric generating facilities should be encouraged to utilize the vast wind, solar, and natural gas resources available in Oklahoma. Available controls for natural gas electric generating facilities are substantially more cost effective and generally capture larger amounts of harmful emissions. Additionally, the extrinsic costs of waste disposal for both dry and wet scrubber captured materials via water treatment or landfill disposal make implementation of such technologies for coal-fired electric facilities less attractive to both the consumers and the citizens of Oklahoma. Therefore, if fuel-switching proposals are offered by BART-eligible sources with detailed timelines that could achieve the objectives of the regional haze SIP, they should be considered in lieu of mandatory BART implementation at the existing coal-fired steam facilities. However, until such proposals are offered with guaranteed timelines, the Sierra Club supports the implementation of BART.

Again, the Sierra Club appreciates the efforts put into developing the regional haze SIP by the ODEQ and applauds their analysis. We look forward to working with all stakeholders involved in the process to develop the most effective rules for preserving air quality and visibility in our nation's protected spaces. Thank you for the opportunity to comment on the Regional Haze SIP.

Sincerely,

Robert "Bud" Scott, Esq.
Government Affairs Director
Oklahoma Chapter
Sierra Club

# EXHIBIT F

 

May 23, 2011

By email: r6air_okhaze@epa.gov

Mr. Joe Kordzi
Air Planning Section (6PD-L)
Environmental Protection Agency
1445 Ross Avenue, Suite 700
Dallas, Texas 75202-2733

Re: EPA Docket EPA-R06-OAR-2010-0190

**Summary of Comments**

  The Sierra Club and WildEarth Guardians (hereinafter "Sierra Club") respectfully submit the following comments on the Environmental Protection Agency ("EPA" or "USEPA") regional haze Federal Implementation Plan ("FIP") for the State of Oklahoma. Our organizations represent thousands of Oklahomans and hundreds of thousands of others throughout the nation that care deeply about protecting public health, air quality at the national parks and wilderness areas, and local economies supported by recreation and tourism. Sierra Club prepared these comments with technical expertise from Camille Sears, Paul Chernick of Resource Insight Inc. and John Plunkett of Green Energy Economics. Their curriculum vitae are attached here.

  On March 22, 2011, EPA proposed to partially approve and partially disapprove Oklahoma's proposed regional haze State Implementation Plan ("SIP"). Sierra Club supports EPA's proposal that will reduce substantial quantities of haze-forming pollutants as required by law, however, Sierra Club encourages EPA to require more stringent reductions in some areas. A FIP is necessary because Oklahoma's $SO_2$ BART plan is business as usual and fails to meet the relevant statutory and regulatory requirements.

  Oklahoma submitted Best Available Retrofit Technology ("BART") determinations for six subcritical pulverized coal boilers: Sooner units 1 & 2: Muskogee units 4 & 5; and Northeastern units 3 & 4 ("plants"). EPA rejected Oklahoma's BART determination for sulfur dioxide ("$SO_2$") because the proposed emissions limit was actually higher than four units already achieve, costs of controls were overestimated and impacts were underestimated. EPA's plan gives Oklahoma a choice to reduce $SO_2$

emissions: install dry scrubbers on six coal-burning units or switch to natural gas to achieve lower emissions.

Our modeling expert has verified EPA's determination that its proposed BART limits will improve visibility at the Wichita Mountains and other nearby Class I areas. Additionally, as described below, we have determined through modeling that all the units specified above violate the $SO_2$ NAAQS, and thus will require further controls to come into compliance with that standard. This is another reason supporting EPA's FIP.

While both of the compliance options described in the FIP are feasible, Sierra Club's technical experts have determined that the fuel-switching option is preferable because it avoids a host of potential costs and environmental impacts that will be incurred if the plants continue to burn coal; integrates better with increased wind-power development; and allows the utilities to employ a range of lower-cost options, including energy-efficiency programs, use of existing facilities, short-term purchase of energy from under-utilized facilities, long-term purchase contracts from excess capacity, and increased use of renewable energy.

Either option could cause rates to increase somewhat, however, Oklahoma has the eighth lowest average electricity rates in the country, at 6.94¢/kWh in 2009, compared to a national average of 9.82¢/kWh. Rates are higher in every neighboring state: Arkansas, Kansas, Missouri, Colorado, New Mexico, and especially Texas, which has rates 42% higher than Oklahoma's. Some of this differential may result from the fact that other states have emission controls on a higher percentage of their coal plants. Of the 322 GW of coal capacity nation-wide, about 190 GW (or 58%) is scrubbed, including about 116 GW of retrofits. Of the 5,300 MW of coal capacity in Oklahoma, only 520 MW (or 10%) is scrubbed.

Though the State of Oklahoma and OG&E and PSO ("the utilities") contend that EPA's proposal infringes on state's rights because air pollution and haze are not contained within state's borders, the Clean Air Act is a state and federal partnership. Oklahoma had flexibility to draw up an implementation plan that meets regulatory requirements, but it did not do so. When a state plan fails to meet requirements, EPA has no choice but to issue a federal implementation plan.[1]

Each state must make a contribution to meeting Congress' national clean air objectives by lowering emissions. Oklahoma's emissions are responsible for visibility degradation in Missouri, New Mexico and Texas,[2] just as surely as Texas' emissions affect Oklahoma.[3] Oklahoma has pointed to Texas as a major contributing source of air pollution in the state.[4] Oklahoma is one of the first states that must reduce emissions

---

[1] 42 U.S.C. 7410(c).

[2] 76 Fed. Reg.16168, 16175.

[3] 76 Fed. Reg.16168, 16176 ("ODEQ indicated that emissions from other states, especially Texas, impeded Oklahoma's ability to meet the URP.")

[4] Oklahoma Fights Texas Over Pollution, (Nov. 17, 2010), *available at* http://www.koco.com/news/25831323/detail.html

because it further along in the regional haze process, but Texas will also have to significantly reduce its emissions. EPA made this clear in its proposal for Oklahoma by delaying action on Oklahoma's reasonable progress goal. "We are not taking action on Oklahoma's submitted RPGs because, as described more fully below, we must first evaluate and act upon the RH SIP revision submitted by the State of Texas."[5]

## TABLE OF CONTENTS

Background ........................................................................................................... 3
Best Available Retrofit Technology (BART) ...................................................... 5
Sulfur Dioxide (SO₂) BART .............................................................................. 6
    Cost ............................................................................................................... 6
    Visibility Impacts ........................................................................................ 7
    Cumulative Impact and Benefit ................................................................. 9
    Natural Gas Switch is Best Option for Oklahoma .................................... 9
        Natural Gas Switch is Feasible ............................................................. 9
        Natural Gas Switching is Superior to Scrubbers ................................ 10
        Details of Resources Available as Part of a Switching Strategy ........ 12
           1. Existing Generation of the Owners of BART-eligible Units ........... 12
           2. Other Existing Generation In and Around Oklahoma .................... 14
           3. Wind Resources ............................................................................. 16
           4. Utility Energy Efficiency Programs ............................................... 17
    Feasibility of Scrubber Option ................................................................. 19
        Three Years is a Reasonable Length of Time to Install Scrubbers .... 19
    The Oklahoma Facilities are Causing Violations of the One-Hour SO2 NAAQs  21
        General Modeling Approach for SO₂ NAAQS Compliance .............. 21
        The OG&E Muskogee Facility is Causing Violations of the One-Hour SO₂ NAAQS ................................................................................... 24
        The OG&E Sooner Facility is Causing Violations of the One-Hour SO₂ NAAQS ................................................................................... 25
        The AEP/PSO Northeastern Facility is Causing Violations of the One-Hour SO₂ NAAQS ................................................................ 27
Nitrous Oxide (NOx) BART ............................................................................. 28
Ammonia and Sulfuric Acid Mist Bart ............................................................ 30
Conclusion ........................................................................................................ 31

## Background

In order to protect their "intrinsic beauty and historical and archeological treasures,"[6] Congress established a national goal to reduce human-caused haze pollution and achieve natural visibility conditions at national parks, wilderness areas, and other designated Class I areas by 2064.[7] In order to meet this goal, states are required to design an implementation plan to reduce, and ultimately eliminate, haze from air pollution

---

[5] 76 Fed. Reg. 16168, 16176.
[6] See H.R. Rep. No.95-294, at 203-04 (1977).
[7] See 42 U.S.C. § 7491(a)(1); 40 C.F.R. § 51.308(d)(1).

sources within its borders that may reasonably be anticipated to cause or contribute to visibility impairment at any protected area located within or beyond that state's boundaries.

Each SIP must provide "emission limits, schedules of compliance and other measures as may be necessary to make reasonable progress towards meeting the national goal."[8]  Two of the most critical features of a regional haze SIP are requirements for (1) the installation of BART technology for delineated major stationary sources of pollution and (2) a long-term strategy for making reasonable progress towards the national visibility goal.[9]

Pollutants that cause visibility impairment also harm public health.  Haze pollutants include nitrogen oxides ("NOx"), sulfur dioxide ("$SO_2$"), particulate matter ("PM"), ammonia, and sulfuric acid.  NOx is a precursor to ground level ozone, which is associated with respiratory diseases, asthma attacks, and decreased lung function.  In addition, NOx reacts with ammonia, moisture, and other compounds to form particulates that can cause and worsen respiratory diseases, aggravate heart disease, and lead to premature death.[10]  Similarly, $SO_2$ increases asthma symptoms, leads to increased hospital visits, and can form particulates that aggravate respiratory and heart diseases and cause premature death.[11]  PM can penetrate deep into the lungs and cause a host of health problems, such as aggravated asthma, chronic bronchitis, and heart attacks.[12]

EPA estimated that in 2015, full implementation of the Regional Haze Rule nationally will prevent 1,600 premature deaths, 2,200 non-fatal heart attacks, 960 hospital admissions, and over 1 million lost school and work days.[13]  The Regional Haze Rule will result in health benefits valued at $8.4 to $9.8 billion annually.[14]  More than 100,000 children and 365,000 adults are diagnosed with asthma in Oklahoma, and hospitalizations in Oklahoma due to asthma cost roughly $57.9 million in 2007 alone.[15]  According to the Clean Air Task Force, the 6 units at issue in the proposed rule annual cause approximately 118 deaths, 181 heart attacks, 2,037 asthma attacks, 86 hospital admissions, 74 cases of chronic bronchitis, and 129 emergency room visits.[16]

While the Regional Haze Rule was designed to provide redress for visibility

---

[8] 42 U.S.C. § 7491(b)(2).

[9] 42 U.S.C. § 7491(b)(2)(A) & (B).

[10] EPA, Health – Nitrogen Dioxide, http://www.epa.gov/air/nitrogenoxides/health.html (last visited Apr. 1, 2011).

[11] EPA, Health – Sulfur Dioxide, http://www.epa.gov/air/sulfurdioxide/health.html (last visited Apr. 1, 2011).

[12] EPA, Health & Environment – Particulate Matter, http://www.epa.gov/air/particlepollution/health.html (last visited Apr. 1, 2011).

[13] EPA, Fact Sheet – Final Clean Air Visibility Rule, http://www.epa.gov/visibility/fs_2005_6_15.html (last visited Apr. 1, 2011).

[14] Id.

[15] Oklahoma State Dept. of Health, Asthma Surveillance Report (2008), *available at* http://www.ok.gov/health/documents/Asthma%20Surveillance%20Report_2008.pdf

[16] Clean Air Task Force, Death and Disease from Power Plants, *available at* http://www.catf.us/coal/problems/power_plants/existing/map.php?state=Oklahoma

impairment, the BART Guidelines expressly provide for the consideration of non-air quality environmental impacts in step four of the 5-step BART process.[17] This consideration includes the environmental impact on human health.

Visibility impairment is measured in deciviews, which is a perceptible change in visibility. The higher the deciview value is, the worse the impairment.[18] Each deciview change is an equal incremental change in visibility perceived by the human eye.

## Best Available Retrofit Technology (BART)

One of the most important parts of a regional haze plan is the requirement that major older sources of air pollution modernize their control equipment by installing BART. BART limits are required for major stationary sources that were in existence on August 7, 1977 and began operating after August 7, 1962 and emit air pollutants that may reasonably be anticipated to cause or contribute to any impairment of visibility is a Class I area.[19] The term "major stationary source" is defined as sources that have the potential to emit 250 tons or more of any pollutant and fall within one of 26 categories of industrial sources defined by the Act.[20] A BART-eligible source is one that meets the above criteria and is responsible for an impact on visibility in a Class I area of 0.5 deciview or more.[21]

BART is defined as an emission limitation:

> . . .**based on the degree of reduction achievable through the application of the best system of continuous emission reduction** for each pollutant which is emitted by an existing stationary facility. The emission limitation must be established, on a case-by-case basis, taking into consideration the technology available, the costs of compliance, the energy and non-air quality environmental impacts of compliance, any pollution control equipment in use or in existence at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology.[22]

---

[17] Section IV.D. of the BART Guidelines at 40 C.F.R. Part 51, Appendix Y.
  STEP 1 -- Identify All Available Retrofit Control Technologies,
  STEP 2-- Eliminate Technically Infeasible Options
  STEP 3-- Evaluate Control Effectiveness of Remaining Control Technologies,
  STEP 4-- Evaluate Impacts and Document the Results, and
  STEP 5 – Evaluate Visibility Impacts.
[18] Details about the deciview can be found in the preamble to the regional haze rule. 64 Fed. Reg. 35714, 35725 (July 1, 1999).
[19] 42 U.S.C. § 7491(b)(2)(A).
[20] 42 U.S.C. § 7491(g)(7).
[21] 40 C.F.R. Part 51, Appendix Y.
[22] 40 C.F.R. §51.301, emphasis added

**Sulfur Dioxide (SO$_2$) BART**

Sierra Club supports EPA's determination that Oklahoma's proposed sulfur dioxide BART limits for coal-fired units do not comply with haze regulations. Under Oklahoma's proposal, most of the units could actually increase their emissions. Oklahoma proposed business as usual: no control and an emission limit of .65 lbs/MMBTU, which is higher than actual emissions from four of the boilers.[23] Oklahoma's proposal was based on significant errors in its BART analysis. It overestimated the costs of controlling SO$_2$ emissions, and it underestimated the visibility benefits.

To address the deficiencies in Oklahoma's submission, EPA proposed to limit sulfur dioxide emissions from six coal-fired boilers to .06 lbs/MMBTU. This emissions limit is based on the amount of control that can be achieved with dry scrubbers, but Oklahoma has flexibility how it chooses to meet this limit. Wet scrubbers can achieve greater control than dry scrubbers, but EPA did not require the more stringent limit because its analysis found that, in this particular case, "the visibility modeling does not show a consistent, clear benefit for wet scrubbing."[24] As EPA points out, however, "there are significant advantages to wet scrubbing that OG&E and/or AEP/PSO may find attractive as a means of satisfying our proposed FIP."[25] "Wet scrubbing achieves better mercury control, avoids the high short-term SO$_2$ emission rates during atomizer change-out at a dry scrubber, creates a reusable byproduct, and does not contaminate the dry ash."[26]

**Cost**

BART cost effectiveness evaluates the cost of controlling pollution in dollars per ton of pollutant removed. Cost effectiveness is calculated according the EPA Air Pollution Control Cost Manual,[27] as stipulated in the BART Guidelines.[28] The cost manual provides a level playing field to estimate the cost of pollution control equipment, which is important in the BART analysis since cost effectiveness is compared to other BART estimates. A control technology is considered to be "cost effective" if it falls within a reasonable range of cost-effectiveness estimates.[29]

As EPA showed in its vigorous report, Oklahoma overestimated the cost of installing dry scrubbers by as much as five times. Oklahoma estimated costs based on a much bigger scrubber than what it assumed in its BART analysis, double-counted some

---

[23] 76 Fed. Reg. 16168, 16182.
[24] 76 Fed. Reg. 16168, 16185.
[25] 76 Fed. Reg. 16168, 16188.
[26] EPA's Technical Support Document, App. C at p. 51.
[27] U.S. EPA, EPA Air Pollution Control Cost Manual, Report EPA/452/B-02-001, 6th Ed., January 2002 ("Cost Manual").
[28] 40 C.F.R. Pt. 51, App. Y at page 25.
[29] 70 Fed. Reg. 39168 (July 6, 2005).

costs, and did not use the conventions from the EPA's cost manual.[30]  Table 4 in the proposed rule shows EPA's corrected cost figures compared to Oklahoma's estimates.

TABLE 4—CONTRAST OF DRY SCRUBBER COST EFFECTIVENESS

|  | EPA's projected cost ($/ton SO2 removed) | ODEQ projected cost ($/ton SO2 removed) |
| --- | --- | --- |
| Sooner 1 | $6,348 | $1,291 |
| Sooner 2 | 7,147 | 1,291 |
| Muskogee 4 | 7,378 | 1,317 |
| Muskogee 5 | 7,493 | 1,317 |
| Northeastern 3 | 3,294 | 1,544 |
| Northeastern 4 | 3,294 | 1,544 |

These corrected figures show that dry scrubbers are a cost effective control option.  EPA's corrected figures for wet scrubbers are similar, found in Table 7.  Sierra Club supports EPA's thorough analysis and conclusion that both dry scrubbers and wet scrubbers are cost effective controls in Oklahoma.[31]

**Visibility Impacts**

Oklahoma also underestimated the visibility impacts of controlling sulfur dioxide emissions.  EPA's modeling, which Sierra Club's expert has confirmed, shows that dry scrubbing will result in 2.89 deciview improvement in visibility at the Wichita Mountains.  Adding modern sulfur dioxide controls to these older Oklahoma coal plants will also improve visibility at Caney Creek and Upper Buffalo in Arkansas, Salt Creek in New Mexico, and Hercules-Glades in Missouri by a cumulative total of 8.20 deciviews.[32]

Based on modeled visibility improvement, Sierra Club agrees that the $SO_2$ emissions from Units 4 and 5 of the OG&E Muskogee plant, Units 1 and 2 of the OG&E Sooner plant, and Units 3 and 4 of the AEP/PSO Northeastern plant should be controlled with the $SO_2$ BART proposed by USEPA.

USEPA prepared CALPUFF modeling to determine the effectiveness of $SO_2$ BART emission limits on improving visibility in four Class I areas:  Wichita Mountains (Oklahoma), Caney Creek (Arkansas), Hercules-Glades (Missouri), and Upper Buffalo (Arkansas).  Visibility improvement is measured in delta deciviews ($\Delta$ dv), with deciview being a haze index based on aerosol light extinction capabilities.  The results of USEPA's CALPUFF visibility modeling are found in Appendix B to their FIP Technical Support

---

[30] 76 Fed. Reg. 16168, 16183.
[31] 76 Fed. Reg. 16168, 16187; *see* Revised BART Cost-Effectiveness Analysis for Flue Gas Desulfurization at Coal-Fired Electric Generating Units in Oklahoma.(Oct. 2010) (App. C to EPAs Technical Support Document).
[32] Table 9 in 76 Fed. Reg. 16168, 16186.

Document.[33]  The results of USEPA's visibility modeling analyses are presented as maximum and average 98th percentile Δ dv impacts for modeling years 2001–2003.

Sierra Club requested and received the CALPUFF modeling files used by USEPA Region 6 in their BART modeling analyses.  The modeling files included CALPUFF, CALPOST, and POSTUTIL input and output files for all of the units subject to BART.  Also included were CALMET meteorological data files and regional ozone files for years 2001 through 2003.  In addition, Sierra Club also received CALPUFF and related modeling files prepared by OG&E and AEP/PSO as part of their BART application analyses, and the CALPUFF files prepared by the Oklahoma Department of Environmental Quality ("ODEQ").

Sierra Club reviewed USEPA's Technical Support Document for the Oklahoma Regional Haze State Implementation Plan and Federal Implementation Plan, with appendices, and the CALPUFF modeling files described above.  We also prepared CALPUFF runs to examine the sensitivity of higher background ammonia levels on visibility improvement from USEPA's proposed $SO_2$ BART (dry scrubbing).  Furthermore, we reviewed USEPA's emission calculations and speciation and concur with the results they obtained.  While our review was not exhaustive, Sierra Club believes that USEPA's CALPUFF modeling and $SO_2$ BART determinations are appropriate.

While remodeling various CALPUFF scenarios, we noticed several possibly incorrect input values.  Sierra Club did not have the time to evaluate the effects of these potential input concerns, but it does not appear that remodeling with corrected values will substantially change results and conclusions developed by USEPA, ODEQ, and the BART applications.  The input values are as follows:

- The base elevation for OG&E Muskogee units 4&5 are modeled as 326 meters.  Using AERMAP and the National Elevation Dataset ("NED"), the base elevation for OG&E Muskogee is 157 meters.  These base elevations appear to be the same in both EPA's and OG&E's CALPUFF input files (input group 13a).

- The base elevation for OG&E Sooner units 1&2 are modeled as 326 meters.  Using AERMAP and NED, the base elevation for OG&E Sooner is 286 meters.  These base elevations appear to be the same in both EPA's and OG&E's CALPUFF input files (input group 13a).

- USEPA's modeled stack gas exit velocity for OG&E Sooner unit 2, LNB, WFGD scenario, is 38.35 meters/second.  OG&E's modeling uses 28.35 meters/second.

---

[33] USEPA, Appendix B, Refined Best Available Retrofit Technology (BART) Modeling Report: OG&E Sooner Generating Station, OG&E Muskogee Generating Station, and AEP/PSO Northeastern Generating Station, March 2011, pp. B-18 – B-21.

## Cumulative Impact and Benefit

EPA appropriately considered the full degree of visibility improvement resulting from the installation of BART controls by considering in its analysis and capturing in its determination the cumulative visibility benefit of installing BART across all Class I areas affected.   The cumulative impact of a source's emissions on visibility as well as the cumulative benefit of emission reductions is a necessary consideration as part of the fifth step in the BART analysis.  Assessing cumulative impacts makes sense as regional haze is a regional issue and reflects the degree of visibility improvement which may reasonably be anticipated from the use of BART.

EPA Region 9 has considered cumulative visibility benefits in its BART determinations for the Four Corners Power Plant and Navajo Generating Station.[34] Region 6 employed a cumulative visibility benefits analysis when determining BART in the FIP for the San Juan Generating Station,[35] and states such as Wyoming and Oregon have proposed regional haze SIPs employing cumulative benefits analyses. Likewise, the federal land managers charged with protection of Class I areas routinely rely on a cumulative assessment of visibility impacts and benefits when determining the level of emissions controls that are cost-effective and technically feasible.[36]

## Natural Gas Switch is Best Option for Oklahoma

### Natural Gas Switch is Feasible

Sierra Club supports EPA's suggestion that switching the BART-eligible boilers from coal to natural gas is the best option to achieve sulfur dioxide reduction in Oklahoma.[37] Paul Chernick of Resource Insight Inc. has provided the following comments on the natural gas option. Thousands of megawatts of coal-fired boilers have been converted to burn gas,[38] including many units converted to oil in the 1960s and 1970s and later to gas, as well as more recent conversions, such as that of Conectiv's Edge Moor plant in 2010. Additional thousands of megawatts of coal capacity have been repowered to more efficient gas combined-cycle operation, including South Carolina's Urquhart, Xcel's Riverside, and TECo's Bayside Station (the repowered Gannon coal units 5 and 6).

Of the three stations with BART-eligible coal units, two have existing major gas supplies. The Muskogee site includes a 173 MW gas boiler plant. Expanding gas supply along an existing pipeline is generally less expensive and faster than building a new line.

---

[34]  See, e.g., 75 Fed.Reg.64221, 64229–30 (Oct. 19, 2010) (Four Corners Power Plant); 75 Fed. Reg. 10174 (Mar. 5, 2010) (Navajo Generating Station).
[35]  76 Fed.Reg. at 501–04.
[36] See, e.g., NPS, General BART Comments, Navajo Generating Station 7/24/09.
[37] 76 Fed. Reg. 16168, 16188.
[38]  Examples include the three large New York City plants (Astoria, Arthur Kill, and Ravenswood), as well as units in Connecticut (Montville) and Massachusetts (West Springfield) and Long Island (Barrett).

The Northeastern site includes a 527 MW gas-fired combined-cycle plant and a 473 MW gas-fired steam plant.

The natural-gas conversion projects can be accomplished quickly and without any consequences to the regional power system. Natural-gas conversion projects generally require less than a year. Actual unit shutdowns are generally accomplished in off-peak seasons. The Southwest Power Pool ("SPP") covers Oklahoma, Kansas, most of Nebraska, and portions of Texas, Arkansas, Missouri, Louisiana, and New Mexico, plus adjacent areas in the remainder of Arkansas and Missouri.[39] Winter peak loads in SPP are about 12,000 MW lower than summer loads, and winter generation capacity is about 1,000 MW higher. Loads in the spring and fall are even lower. Regional power supply should be more than adequate even if a few of the roughly 500-MW BART-eligible units are shut down simultaneously in off-peak months.

Even some overlap of outages into the summer should not cause any problems. Capacity in SPP exceeded the required reserve level by about 4,500 MW in 2010 and is projected to exceed requirements by about 6,500 MW in 2014. There is clearly enough capacity to allow the shutdown of multiple 500-MW BART-eligible units, even in the summer.

### Natural Gas Switching is Superior to Scrubbers

Sierra Club views the non-scrubbing compliance option more broadly than simply switching the existing units to burn gas. It should be approached as a flexible strategy that might rely on a combination of fuel-switching, energy-efficiency deployment, increased use of existing gas capacity, and increased wind development.

The gas-switching option is superior to the scrubbers in several respects:

- The switching option reduces NOx emissions, eliminates emissions of mercury and other air toxics, nearly eliminates particulates and $SO_2$, ends the production of toxic fly ash and bottom ash, and avoids the need for disposal of scrubber waste.

- The scrubber option leaves the utilities vulnerable to future environmental costs, particularly addition of baghouses for control of particulates and heavy metals under the pending MACT rule and the costs of better containing coal combustion residuals. The fuel-switching option avoids these expenditures.

- A baghouse for any of these 500-MW units would cost about 85 million in capital, $0.63/kW yr annually, and consume about 0.6% of the unit's energy and capacity.[40]

---

[39] The transmission system in the remainder of Louisiana and even western Mississippi is managed by SPP, and generation in this area may also be available to Oklahoma utilities, but this area is not included in the analysis below. The non-SPP portions of Texas and New Mexico are parts of the Texas (ERCOT) and Western (WSCC) interconnections, and are not well connected to SPP.

[40] Sergent & Lundy, IPM Model – Revisions to Cost and Performance for APC Technologies, March 2011, *available at* http://www.epa.gov/airmarkets/progsregs/epa-ipm/docs/append5_5.pdf

- The North American Electric Reliability Council ("NERC") estimates that complying with requirements to contain coal ash and scrubber waste would cost about $30 million in capital investment (or $180 million for the six units) plus $15–$37.50 per ton of residual.[41] For the amount of ash generated by the BART-eligible units in 2005, this would be $2–$5 million annually for the six units if they can continue selling fly ash and bottom ash, and $9 million if the environmental restrictions and other factors preclude sale of the ash. In addition, based on the FGD waste produced per MWh at scrubbed plants that also burn Wyoming-mined Powder River Basin coal, scrubbing the six BART-eligible units could produce more than 600,000 tons of FGD waste byproducts, which could cost up to $22 million annually, depending on the extent to which forthcoming rules restrict reuse of those product.

- The six BART-eligible units are all over 30 years old. If they continue to operate as baseload coal-fired units, they are likely to require major repairs, rehabilitation or replacement within a decade of installation of the scrubbers. After conversion to less-corrosive gas firing, the units would operate at low capacity factors or spend most of their time in standby, avoiding those additional costs.

- As the amount of wind in Oklahoma and the SPP rises, fossil generation will need to ramp production up and down more frequently, and to shut down for various periods of time during high wind production. The switching option would result in plants better suited to integrate with variable wind generation, both technically (since coal plants generally ramp more slowly than gas plants and often require longer periods between starts and stops) and economically (since the large investment in scrubbing and other environmental compliance will be partially stranded if coal units are often ramped down to accommodate wind energy, while gas plants would avoid their fuel costs).

- Oklahoma is a major exporter of natural gas, but a major importer of coal, including the coal burned by the six units.[42] The scrubbing option would continue those imports, requiring rail transport of large amounts of coal, while the switching option would use an indigenous resource.

If Oklahoma Gas & Electric ("OG&E") and Public Service Company of Oklahoma ("PSO" or "PSO/AEP") do not scrub these BART-eligible units, they would have a number of attractive options for meeting their customers' needs while keeping emissions below those anticipated in the FIP. The switching option is consistent with a much broader compliance strategy, in which some of the six units may be converted to burn gas in their boilers, as EPA suggests, while others are replaced by a combination of:

- Reduced energy use and peak load through energy-efficiency programs and demand response.

---

[41] 2010 Special Reliability Scenario Assessment: Resource Adequacy Impacts of Potential U.S. Environmental Regulations, NERC, October 2010, p. 5

[42] Oklahoma purchases all of its coal—$494 million annually—from Wyoming, except for a small test burn of Colombian coal in 2010.

- Increased use of the utilities' gas-fired plants.

- Spot or short-term contract purchases from other utilities and generators.

- Purchase of existing plants, especially efficient gas combined-cycle merchant plants.

- Long-term contract purchases from existing plants.

- Increased purchases from or ownership of new wind farms.

**Details of Resources Available as Part of a Switching Strategy**

**1. Existing Generation of the Owners of BART-eligible Units**

Both the OG&E and PSO utilities own gas resources that are significantly underutilized. As shown in Table 1 below, bringing these units to reasonably full output (60% for steam plants and modern combustion turbines and 85% for gas combined-cycle) would produce 41,200 GWh annually, more than twice the annual generation by the six BART-eligible units of about 19,000 GWh.

OG&E owns 2,665 MW of gas-fired steam plants, which operated at an average capacity factor of only about 19% in 2009; 91 MW of modern, high-efficiency combustion turbines, which have operated at capacity factors of 2–5% in recent years;[43] and 1,165 MW of combined-cycle gas, which operated at an average capacity factor of 52%.[44]

PSO owns 2,192 MW of gas-fired steam plants, which operated at an average capacity factor of only about 19% in 2009; about 310 MW of modern, high-efficiency combustion turbines; and 689 MW of combined-cycle gas, which operated at an average capacity factor of 52%. In addition, its sister American Electric Power ("AEP") operating company Southwest Electric Power Company ("SWEPCo"), owns 1,818 MW of gas-fired steam plants and about 290 MW of modern combustion turbines in SPP, which operated at an average capacity factor of only about 30% in 2009. In addition to the steam plants, OGE and PSO/SWEPCo own 91 MW and 604 MW respectively of modern, high-efficiency combustion turbines, which have operated at capacity factors of 2–5% in recent years, but could operate as essentially baseload generators.

These plants could easily operate at higher capacity factors of 60% as to the gas steam plants (most of which were originally designed as baseload units) and the modern combustion turbines (many cogeneration systems and combined-cycle plants use similar combustion turbines in baseload operation) and 85% for the gas combined-cycle units, all

---

[43] These combustion turbines are about as efficient as the gas steam plants.
[44] All capacity ratings in these comments are summer capacities from the Energy Information Administration EIA-860 database. Capacity factors are computed from the energy provided in the EIA-923 database.

of which are modern and designed to run as baseload service (generally with great flexibility).

**Table 1: Under-Utilized Capacity Owned by OG&E and PSO**

| Owner | Plant Type | Summer MW | 2009 CF | Additional Available GWh |
|---|---|---|---|---|
| OGE | Combined-Cycle | 1,165 | 52% | 3,368 |
| OGE | Gas Steam | 2,665 | 19% | 9,572 |
| OGE | Modern CT | 91% | 5% | 438 |
| PSO | Combined-Cycle | 689 | 52% | 1,992 |
| PSO | Gas Steam | 2,192 | 19% | 12,673 |
| OGE | Modern CT | 310 | 2% | 2,254 |
| SWEPCo | Gas Steam | 1,818 | 30% | 8,759 |
| SWEPCo | Modern CT | 294 | 1% | 2,163 |
| **Total** | | | | 41,219 |

The cost of increasing output from these plants is limited to the cost of additional fuel. As shown in Table 2, those costs are quite reasonable. Table 2 (1) starts with the prices for Henry Hub gas futures, (2) reduces them 13% to reflect the 2006–2010 ratio of gas prices on the ONEOK system in Oklahoma to the Henry Hub price, and (3) applies heat rates of 9,500 Btu/kWh for steam plants and modern combustion turbines and 7,500 Btu/kWh for combined-cycle plants.

**Table 2: Costs of Incremental Energy from Existing PSO and OG&E Plants**

| | Gas Price $/MMBtu | | Electric Energy Cost $/MWh | |
| | Henry Hub [1] | ONEOK [2] | Gas Steam and New CTs [3] | Combined Cycle [4] |
|---|---|---|---|---|
| Heat Rate (Btu/kWh) | | | 9,500 | 7,500 |
| 2011 | $4.34 | $4.17 | $39.6 | $31.3 |
| 2012 | $4.90 | $4.70 | $44.6 | $35.2 |
| 2013 | $5.27 | $5.06 | $48.1 | $38.0 |
| 2014 | $5.61 | $5.39 | $51.2 | $40.4 |
| 2015 | $5.98 | $5.74 | $54.5 | $43.1 |
| 2016 | $6.32 | $6.06 | $57.6 | $45.5 |
| 2017 | $6.60 | $6.34 | $60.2 | $47.5 |
| 2018 | $6.89 | $6.62 | $62.9 | $49.6 |
| 2019 | $7.19 | $6.90 | $65.5 | $51.7 |
| 2020 | $7.48 | $7.18 | $68.2 | $53.8 |
| 2021 | $7.77 | $7.46 | $70.9 | $56.0 |
| 2022 | $8.08 | $7.76 | $73.7 | $58.2 |
| 2023 | $8.35 | $8.02 | $76.2 | $60.2 |

While they would not normally operate for long periods during the year, OG&E and PSO can call as needed on 134 MW and 163 MW of older, less-efficient owned combustion turbines that now operate at less than 1% capacity factors.[45]

2. Other Existing Generation In and Around Oklahoma

In addition to the generation owned by OG&E and PSO/AEP, a large amount of combined-cycle and steam natural-gas capacity is underutilized in Oklahoma and surrounding areas. The relevant region for this analysis includes SPP, which covers Oklahoma, Kansas, most of Nebraska, and portions of Texas, Arkansas, Missouri, Louisiana, and New Mexico, plus adjacent areas in the remainder of Arkansas and Missouri.[46] This includes about 5,000 MW of gas steam that operated at an average capacity factor of 17% in 2009, 6,800 MW of gas combined-cycle that operated at an average capacity factor of 23%, and at least 1,500 MW of modern combustion turbines

---

[45] These old peaking units are much less efficient than the new combustion turbines and the steam plants and would be operated only as back-up for other resources.

[46] The transmission system in the remainder of Louisiana and even western Mississippi is managed by SPP, and generation in this area may also be available to Oklahoma utilities, but this area is not included in the analysis below. The non-SPP portions of Texas and New Mexico are parts of the Texas (ERCOT) and Western (WSCC) interconnections, and are not well connected to SPP.

operating at an average capacity factor of 5%.[47] This additional potential generation from underutilized plants totals about 60,000 GWh, nearly three times the energy output of the BART-eligible units.

**Table 3: Other Under-utilized Capacity In and Around Oklahoma**

| Plant Type | Summer MW | 2009 CF | Additional GWh |
|---|---|---|---|
| Combined-Cycle | 5,000 | 23% | 27,200 |
| Gas Steam | 6,800 | 17% | 25,600 |
| Modern CT | 1,500 | 5% | 7,200 |
| Total | | | 60,000 |

Of the combined-cycle capacity, approximately 9,200 MW is owned by merchant generators, as listed in Table 4.[48] This capacity is generally not committed to serving load, and is sold in the spot market or under short-term contracts.

**Table 4: Merchant Combined-Cycle Capacity in and around SPP**

| Plant | Owner | State | Summer Net MW | Capacity Factor |
|---|---|---|---|---|
| Oneta Energy Center | Calpine Central L P | OK | 1,086 | 32% |
| Hobbs Generating Station | CAMS NM LLC | NM | 526 | 71% |
| Evangeline Power Station | Cleco Evangeline LLC | LA | 732 | 32% |
| Mustang Station | Denver City Energy Assoc LP | TX | 486 | 59% |
| Dogwood Energy Facility | Dogwood Energy LLC | MO | 614 | 16% |
| Eastman Cogeneration Facility | Eastman Cogeneration LP | TX | 402 | 57% |
| Harrison County Power Project | Entergy Power Ventures LP | TX | 514 | 12% |
| Green Country Energy LLC | Green Country OP Services LLC | OK | 783 | 55% |
| Kiamichi Energy Facility | Kiowa Power Partners LLC | OK | 1,178 | 51% |
| Pine Bluff Energy Center | Pine Bluff Energy LLC | AR | 192 | 80% |
| Union Power Partners LP | Union Power Partners LP | AR | 2,020 | 24% |
| Hot Spring Power Project | Hot Spring Power Co LLC | AR | 642 | 49% |
| Trigen St.Louis | Trigen St Louis Energy Corporation | MO | 13 | 37% |
| TOTAL | | | 9,189 | 39% |

As part of the overall fuel-switching strategy, OG&E or PSO may find that it is cost-effective to purchase some of these plants outright, or to purchase their capacity

---

[47] To simplify the tabulation of combustion turbines, this total includes only post-1998 combustion turbines in Oklahoma, Arkansas, Kansas, Nebraska and western Missouri. There may be additional efficient modern combustion turbines in these areas, as well as in SPP Texas.

[48] Some of the modern combustion turbine capacity is also owned by merchant generators.

under long-term contracts. A number of the owners of combined-cycle plants have sold all or part of their plants to utilities in recent years, including those in the table below, often at costs well below that of a new gas combined-cycle, which OG&E estimates at $1,003/kW in 2010 dollars, plus financing costs. (OG&E 2011 Integrated Resource Plan, Table 4). Some of the sales are of plants somewhat remote from Oklahoma (geographically and/or electrically); their costs are indicative of the market value of this technology in the mid-south region. Indeed, areas such as ERCOT, Louisiana, and Mississippi would tend to have higher market prices for power and power plants than the locations in Table 4.

**Table 5: Sales of Combined-Cycle Plants in and around SPP**

| Seller | Plant Name | State | Closing Date | % sold | Capacity (MW)[a] | Acquirer | Purchase Price $M | $/kW |
|--------|-----------|-------|--------------|--------|-----------------|----------|-------------------|------|
| NRG Energy | McClain | Okla. | 7/9/04 | 77% | 377 | Oklahoma G&E | $160 | $425 |
| CLECo | Perryville | La. | 6/30/05 | 100% | 831 | Entergy LA | $170 | $205 |
| Central Mississippi Generating | Attala | Miss. | 3/31/06 | 100% | 500 | Entergy MS | $88 | $176 |
| Calpine | Aries/Dogwood | Mo. | 2/7/07 | 100% | 677 | Kelson Energy | $234 | $345 |
| Cogentrix Energy | Ouachita | La. | 5/4/07 | 100% | 904 | Entergy AR | $198 | $219 |
| Calpine | Acadia Energy | La. | 8/17/07 | 50% | 1,376 | Cajun Gas Energy | $189 | $137 |
| GE Energy Financial Services | Green Country | Okla. | 10/2/07 | 100% | 904 | J-Power USA Generation | $240 | $265 |
| Cogentrix | Southaven Power | Miss. | 5/9/08 | 100% | 904 | Tennessee Valley Authority | $461 | $510 |
| Kelson | Redbud | Okla. | 9/30/08 | 100% | 1,338 | Oklahoma Gas & Electric | $339 | $253 |
| Tennessee Valley Authority | Southaven Power | Miss. | 10/6/08 | 70% | 633 | Seven States Power | $345 | $545 |
| Acadia Power Partners | Acadia 1 | La. | Feb '10 | | 580 | CLECo | $304 | $524 |
| Kelson | Cottonwood | Texas | Aug '10 | 100% | 1,279 | NRG Energy | $525 | $410 |
| Calpine | Freestone | Texas | Dec '10 | 25% | 1,038 | Rayburn Coop | $215 | $830 |
| PSEG | Odessa | Texas | 1/13/11 | | 1,000 | High Plains Diversified Energy | $687 | $344 |
| PSEG | Gaudelupe | Texas | 1/13/11 | | 1,000 | Wayzata Investment | | |
| Acadia Power Partners | Acadia 2 | La. | 4/29/11 | | 580 | Entergy LA | $300 | $517 |
| Sequent | Wolf Hollow | Texas | 5/13/11 | 100% | 720 | Exelon | $305 | $424 |
| KGen Partners | Hinds | Miss. | Mid-2012 | 100% | 520 | Entergy AR | $206 | $396 |
| KGen Partners | Hot Spring | Ark. | Mid-2012 | 100% | 630 | Entergy MS | $253 | $408 |

Notes:

    a. Summer capacity reported by owner or EIA.

### 3. Wind Resources

While some gas capacity will be needed for effective integration of the wind output, it appears that OG&E could replace a significant share of the output of the

BART-eligible units with wind, and save money in the process. Since PSO's generation mix is very similar to OG&E's, additions of wind to PSO's portfolio are likely to be similarly favorable.

Oklahoma and other parts of SPP have enormous potential for wind-farm development. As of July 2010, the SPP transmission interconnection queue included 111 projects, totaling 20,274 MW, plus 7,470 MW of incremental wind development under approved generation interconnection agreements, above the 3,300 MW of wind in service (First Status Report OF Southwest Power Pool, Inc., in Response to Order on Interconnection Queue Reform, Docket No. ER09-1254-000, July 30, 2010.) SPP is engaged in major transmission expansions, to bring additional wind from the western part of the region to the load centers in the east. (2010 SPP Transmission Expansion Plan, pp. 33-34) Clean Line Energy's proposed Plains and Eastern merchant transmission project would bring about 7,000 MW of wind from western Oklahoma through the Oklahoma load centers to Arkansas and Tennessee. Clean Line Energy's proposed Grain Belt Express would bring east another 3,500 MW from Kansas and the Oklahoma panhandle.

Of this tremendous potential, OG&E owns 449 MW of wind and has another 332 MW under contract, while PSO has 198 MW of wind under long-term contract. In its 2011 Integrated Resource Plan, OG&E estimates that the energy cost savings from generic wind additions displacing its current marginal energy supplies—a mix of coal and gas—would have a present value of about $2,600/kW. (IRP, May 2011, p. 32).

Production tax credits ("PTCs"), if they are extended, would provide benefits of another $840/kW. The Crossroads Wind Farm, which OG&E is currently building, is expected to cost $1,760/kW; including financing costs, taxes and operating costs, the present value of the Crossroads Wind Farm cost would be about $2,300, indicating that it will be saving OG&E customers about $300/kW without the PTC and $1,140/kW with the PTC. In the fuel-switching case, OG&E's marginal energy supplies would be somewhat more expensive, suggesting that the benefits of additional wind would be even greater as part of a least-cost plan to replace the energy from the BART-eligible coal units. The OG&E IRP shows the present value benefit of wind purchases increasing by about $280/kW in the fuel-switching case, for a total value of $580/kW for a facility like the Crossroads Wind Farm without the PTC and $1,420/kW with the PTC.

### 4. Utility Energy Efficiency Programs

Energy-efficiency programs funded through utility rates and implemented by the utility, state agencies or contractors have become a common and important part of plans for meeting customer loads while minimizing costs and environmental impacts. In many situations, electric energy-efficiency portfolios have consistently achieved annual electric energy savings exceeding one percent of total annual sales, with those savings continuing over many years. The leading efficiency administrators have been realizing annual electric energy savings of more than 1.5% of electric energy sales, as summarized in Table 6. These incremental annual savings accumulate over time, so that Connecticut's 2004–2010 savings, for example, have reduced 2010 sales by about 7.5% of sales.

**Table 6: Incremental Annual Energy Usage Reduction Through Efficiency Programs, Selected States**

| State | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|-------|------|------|------|------|------|------|------|
| CA | 0.9% | 1.6% | 0.9% | 1.8% | 2.5% | 1.8% | |
| CT | 1.0% | 1.0% | 1.1% | 1.0% | 1.2% | 0.8% | 1.4% |
| IA | 0.6% | 0.7% | 0.8% | 0.8% | 0.9% | 1.2% | 1.2% |
| MA | 0.9% | 0.9% | 1.0% | 1.2% | 1.0% | 1.1% | 1.3% |
| ME | | | 0.5% | 0.7% | 0.9% | 0.7% | 0.8% |
| NJ | 0.4% | 0.5% | 0.2% | 0.3% | 0.4% | 0.6% | |
| NY | 0.2% | 0.6% | 0.6% | 0.5% | 0.6% | 0.6% | 0.8% |
| RI | | 0.8% | 1.2% | 1.0% | 0.8% | 1.1% | 1.1% |
| VT | 0.8% | 0.9% | 0.9% | 1.6% | 2.3% | 1.5% | 2.0% |
| WI | | | | | | 0.6% | 0.5% |

Notes: Not all states have reported 2010 results. New York data are difficult to compile after 2007, due to changes in reporting and program responsibility. New York expenditures and goals increased dramatically in 2009. NY 2008-2010 values are for LIPA

Plans for 2011 and beyond are even more ambitious, with Massachusetts investor-owned utilities committed to savings of 2.4% annually by 2012 and a total of about 17% of 2020 sales (just from program activities in 2010 through 2020). In late 2010, Oklahoma's neighboring state Arkansas, which is served in part by OG&E and PSO's affiliate SWEPCo, established electric-utility efficiency goals of 0.25% of energy use in 2011, 0.50% in 2012, and 0.75% in 2013 (Docket No. 08-137-U, Order No. 15, December 10, 2010, p. 18). These savings have been quite inexpensive. Leading efficiency program administrators have spent on average about $0.24 to save a kWh each year for an average of about 12 years, or only about 2¢/kWh saved.

OG&E and PSO could easily replicate best practices in financial, marketing, and technical strategies employed by the nation's leading program administrators and achieve comparable results. In 2010, OG&E started offering a limited portfolio of residential and commercial efficiency programs in Oklahoma, which it is only committed to running through 2012. Even this very tentative first step is projected to reduce 2012 energy sales by 144 GWh or 0.63 percent. OG&E could continue ramping up its initial pilot programs over the next few years to reach the levels achieved by the leading efficiency portfolios. Meeting SWEPCo's goals in Arkansas through 2013 would be a significant step in this direction. While PSO is starting somewhat behind OG&E in this regard, PSO can build on staff experience of its affiliate in Arkansas, and adopt program designs and materials developed by OG&E and SWEPCo.

If OG&E matched the performance of the leading group of efficiency portfolios in other states by saving 1 percent of forecast sales per year, it would displace the need for 1,200 GWh/year of energy generation after 5 years and 2,100 GWh/year after 10, even after allowances for gradual decline in installed measures over time. At a savings rate of 1.5% of annual sales, OG&E could reduce electric energy requirements by 1,800

- 18 -

GWh/year after 5 years and 3,100 GWh/year (roughly the output of one of the Muskogee or Sooner coal units) after 10 years. Given the experience in other jurisdictions, OG&E and PSO should be able to reach the 1% annual incremental savings level by 2015 and 1.5% annual savings soon thereafter. Those same energy-efficiency programs would reduce OG&E's need for capacity by about 300–500 MW (or up to one BART-eligible unit) by 2017 and 500–700 MW by 2022.

Since PSO is a smaller utility than OG&E, and since PSO would take somewhat longer to ramp up its programs, its savings would be 25%–30% lower than OG&E's. Even so, efficiency programs could reduce energy requirements by the equivalent of a significant portion of a Northeastern coal unit.

## Feasibility of Scrubber Option

Retrofitting of scrubbers is now routine in the US. Some 290 coal-fired units totaling about 116,000 MW nationwide have been retrofit with scrubbers since 1990. These retrofits have included units in 35 states, with unit sizes ranging from under 20 MW to 1,300 MW, installed in 1943 through 1996.

### Three Years is a Reasonable Length of Time to Install Scrubbers

Sierra Club supports EPA's finding that three years is enough time for installation of dry scrubbers on the six BART-eligible units. EPA is required under the Clean Air Act to adopt a compliance deadline that reflects expeditious installation of pollution controls. Under the guidelines, "each source subject to BART [is] required to install and operate BART as expeditiously as practicable, but no later than five years after the date of EPA's approval."[49] (emphasis added). Three years of time from the effective date of the final rule is a reasonable length of time to install the required pollution controls and comply with these emission limitations.

The companies subject to this rule are currently on notice that they will have to comply within three years of EPA promulgation of a final rule. So, as of today, they have more than three years to comply. Engineering studies and planning can begin now.

There are numerous examples of $SO_2$ scrubbers being installed at coal-fired power plants within a three year timeframe. For example, a new $SO_2$ scrubber was installed at the Brandon Shores power plant, and according to the company's website, construction took three years.[50] American Electric Power completed construction of a scrubber at its John Amos power plant Unit 3 in three years.[51] TVA installed new $SO_2$ scrubbers at its Bull Run and Kingston power plants in about three years as well.[52]

---

[49]  40 CFR 51.308(e)(1)(iv).

[50] *See* http://www.constellation.com/SocialResponsibility/EnvironmentalPerformance/Pages/BrandonShoresScrubber.aspx.

[51]  *See* http://statejournal.com/story.cfm?func=viewstory&storyid=54167&catid=283.

[52] *See* http://www.knoxnews.com/news/2008/nov/21/new-scrubber-at-bull-run-plant-may-help-improve/.
*See also* http://msbusiness.com/blog/2010/06/tva-puts-new-scrubbers-in-operation/.

Installations of $SO_2$ scrubbers have even been accomplished in less than three years. For example, Indianapolis Power & Light installed an $SO_2$ scrubber at Unit 7 of its Harding Street Station in less than three years, with construction beginning in May 2005 and being completed in September 2007.[53] A new scrubber was installed at Gulf Power Company's Plant Crist to scrub the $SO_2$ from 4 coal-fired boilers in less than three years from engineering design of the scrubber to operation.[54]

These are but a few of numerous such examples that SO2 scrubbers can be installed in three years or less time. Accordingly, EPA has often required scrubber installation to occur in three years or less time in its settlement agreements for purported Clean Air Act violations at coal-fired EGUs. For example, the December 2008 Consent Decree regarding Salt River Project's Coronado station required installation and operation of an $SO_2$ scrubber at Unit 1 by January 1, 2012 which essentially reflects three years for design, construction, and operation.[55] The October 2007 consent decree with American Electric Power requires SO2 scrubbers to be installed and operational at numerous of the units coal-fired EGUs within three years or less of the date of the settlement agreement, including John Amos Units 1, 2, and 3, Cardinal Units 1 and 2, Conesville Unit 4, Mitchell Units 1 and 2, and Mountaineer Unit 1.[56]

These examples and others provide ample support that three years for installation of SO2 controls and compliance with EPA's proposed BART limits is reasonable. In fact, these examples show that a BART compliance deadline for SO2 controls that went any longer than three years would not comport with the Clean Air Act requirement that BART be met as expeditiously as practicable.

Given the broad superiority of the switching option over the scrubbing option, Sierra Club would accept the extension of the compliance period for switching to five years.

---

[53] *See* Indianapolis Power & Light Company (IPL)Harding Street Station Unit 7 Scrubber Fact Sheet, available for download from http://www.iplpower.com/ipl/index?page=IPLGeneral&Menu=06000000&DocID=02039b33d0a010bcb03 1eea007b7f.
[54] Specifically, the award for engineering and design was awarded in May 2007 (see http://www.bv.com/wcm/press_release/05072007_1374.aspx), and the scrubber came on-line and was operational at the end of 2009 (see http://www.gulfpower.com/about/plant_crist.asp).
[55] *See* Salt River Project Agricultural Improvement and Power District Clean Air Act Settlement, Consent Decree at 15, available at http://www.epa.gov/compliance/resources/decrees/civil/caa/srp-cd.pdf.
[56] *See* American Electric Power Service Corporation Settlement, Consent Decree at 29-30, available at http://www.epa.gov/compliance/resources/decrees/civil/caa/americanelectricpower-cd.pdf.

**The Oklahoma Facilities are Causing Violations of the One-Hour SO2 NAAQs**

Sierra Club performed air dispersion modeling demonstrating that the $SO_2$ emissions from these sources are also causing violations of the one-hour $SO_2$ National Ambient Air Quality Standard ("NAAQS"). While USEPA's FIP and proposed $SO_2$ BART pertains to regional haze, the existing $SO_2$ NAAQS violations from the OG&E Muskogee and Sooner facilities, and the AEP/PSO Northeastern plant, will require that Oklahoma prepare a SIP demonstrating an adequate program to implement, maintain, and enforce the $SO_2$ NAAQS. The Clean Air Act requires that Oklahoma prepare the $SO_2$ NAAQS SIP by June 3, 2013.[57] USEPA's proposed $SO_2$ BART will have multiple benefits, including likely compliance of the one-hour $SO_2$ NAAQS from these subject facilities.

The one-hour $SO_2$ NAAQS takes the form of a three-year average of the 99th-percentile of the annual distribution of daily maximum one-hour concentrations, which cannot exceed 75 ppb.[58] This standard is to be verified using USEPA's AERMOD air dispersion model, which produces air concentrations in units of $\mu g/m^3$. The one-hour $SO_2$ NAAQS of 75 ppb is equal to 196.5 $\mu g/m^3$. The 99th-percentile of the annual distribution of daily maximum one-hour concentrations corresponds to the fourth-highest value at each receptor for a given year. The modeling methods we used, and the model results, are discussed below.

### General Modeling Approach for SO2 NAAQS Compliance

Sierra Club used USEPA's AERMOD v. 11103 for our dispersion modeling analysis, which is the most recent version of the model. This version also includes the output option MXDYBYYR, which greatly facilitates the information needed to determine compliance with the form of the one-hour $SO_2$ NAAQS. Sierra Club's modeling results are based on the fourth-highest value at each receptor in the MXDYBYYR output files, averaged over the number of years modeled.

Sierra Club's modeling results, however, do not include impacts from other nearby $SO_2$ NAAQS-consuming sources, nor do they include regional background levels. Accordingly, these modeled impacts are most certainly under-estimating actual total air concentrations. Moreover, the modeled impacts presented below are caused solely by each facility's $SO_2$ emissions.

Sierra Club developed terrain elevations for the modeled sources and receptors using USEPA's AERMAP program (v. 11103). Terrain elevation data were extracted from NED files covering the regions of interest. Sierra Club first modeled receptors in a grid

---

[57] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, March 24, 2011, p. 3.
[58] USEPA, Applicability of Appendix W Modeling Guidance for the 1-hour $SO_2$ National Ambient Air Quality Standard, August 23, 2010.

with 200-meter spacing, and then modeled refined receptor grids with 50-meter spacing in the areas of highest initial modeled impacts.

Sierra Club also developed meteorological data for modeling each of the three BART-subject facilities. Using AERMET v. 11059, Sierra Club created AERMOD-ready surface and profile meteorological data files for years 2005 through 2009 for each facility. Surface data inputs to AERMET include Integrated Surface Hourly data ("ISHD") files and one-minute ASOS data obtained from the National Climatic Data Center ("NCDC"). The ISHD data are included in yearly ISHD DVDs sold directly by NCDC. The one-minute ASOS data were downloaded from NCDC's website, and processed with USEPA's AERMINUTE program (v. 11059).[59]

Sierra Club supplemented the ISHD files with one-minute ASOS data to reduce the number of calm hours typically found in hourly airport ASOS data. In their modeling guidance for $SO_2$ NAAQS designations, USEPA addresses the concern of calm hours in verifying compliance with the one-hour $SO_2$ NAAQS:

> In AERMOD, concentrations are not calculated for variable wind (i.e., missing wind direction) and calm conditions, resulting in zero concentrations for those hours. Since the $SO_2$ NAAQS is a one hour standard, these light wind conditions may be the controlling meteorological circumstances in some cases because of the limited dilution that occurs under low wind speeds which can lead to higher concentrations. The exclusion of a greater number of instances of near-calm conditions from the modeled concentration distribution may therefore lead to underestimation of daily maximum 1-hour concentrations for calculation of the design value.

> To address the issues of calm and variable winds associated with the use of NWS meteorological data, EPA has developed a preprocessor to AERMET, called AERMINUTE (U.S. EPA. 2011a) that can read 2-minute ASOS winds and calculate an hourly average. Beginning with year 2000 data, CDC has made freely available, the I-minute winds, reported every minute from the ASOS network. The AERMINUTE program reads these 2-minute winds and calculates an hourly average wind. In AERMET (U.S. EPA, 2004c), these hourly averaged winds replace the standard observation time winds read from the archive of meteorological data. This results in a lower number of calms and missing winds and an increase in the number of hours used in averaging concentrations.[60]

Upper air data for AERMET input are in Forecast Service Lab ("FSL") format, and are available by downloading from the National Oceanic and Atmospheric

---

[59] ftp://ftp.ncdc.noaa.gov/pub/data/asos-onemin/
[60] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, Attachment 3, March 24, 2011, p. 19.

Administration ("NOAA") website.[61]  Upper-air data are collected by a weather balloon that is released twice per day at selected locations (Norman, Fort Sill, and Lamont in Oklahoma).  As the balloon is released, it rises through the atmosphere, and radios the data back to the surface.  The measuring and transmitting device is known as either a radiosonde or rawindsonde.  Data collected and radioed back include:  air pressure, height, temperature, dew point, wind speed, and wind direction.

Micrometeorological parameters required for AERMET stage 3 processing were developed using USEPA's AERSURFACE program (v. 08009).  The determining site characteristics are the micrometeorological parameters known as albedo, Bowen ratio, and surface roughness.  Albedo is the fraction of total incident solar radiation reflected by the surface back to space (whiter surfaces have higher albedo). The Bowen ratio is an indicator of surface moisture.  It is the ratio of sensible heat flux to latent heat flux and drier areas have a higher Bowen ratio.  Surface roughness, shown in shorthand as ("$z_0$"), is an essential parameter in estimating turbulence and diffusion.  Technically, it's the height above the ground that the log wind law extrapolates to zero.  In essence, $z_0$ can be thought of as a measure of how much the surface characteristics interfere with the wind flow.  Very smooth surfaces, like short grass or calm ponds, have very low values of $z_0$ – on the order of 0.01 meter or less.  Tall and irregular surfaces, which are a greater obstacle to wind flow, have higher values of $z_0$ – up to 1.0 meter or more for forests.

Using AERSURFACE, Sierra Club extracted albedo, Bowen ratio, and surface roughness data from 1992 land use and land cover data for Oklahoma.  Sierra Club used average moisture conditions, seasonal periods, and 60-degree sectors for AERSURFACE processing.

While BART visibility modeling analyses use actual 24-hour emissions, compliance with the one-hour $SO_2$ NAAQS must rely on maximum allowable emissions or federally enforceable permit limits.  From USEPA's Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards:

> Consistent with past $SO_2$ modeling guidance (Section 4.5.2 of U.S. EPA (1994)) and regulatory modeling for other programs (Appendix W, Section 8.1), dispersion modeling for the purposes of designations should be based on the use of maximum allowable emissions or federally enforceable permit limits. Also consistent with past and current guidance, in the absence of allowable emissions or federally enforceable permit limits, potential to emit emissions (i.e., design capacity) should be used. Because of the short-term nature of the new $SO_2$ NAAQS, the maximum short term or hourly emission rate should be input into AERMOD for each modeled hour.[62]

---

[61] http://esrl.noaa.gov/raobs/
[62] USEPA, Area Designations for the 2010 Revised Primary Sulfur Dioxide National Ambient Air Quality Standards, March 24, 2011, p. 9.

Accordingly, Sierra Club's one-hour $SO_2$ NAAQS compliance used allowable $SO_2$ emissions for each of the subject facilities modeled.

**The OG&E Muskogee Facility is Causing Violations of the One-Hour $SO_2$ NAAQS**

Sierra Club prepared a one-hour $SO_2$ NAAQS compliance modeling analysis of OG&E's Muskogee facility $SO_2$ emissions. Sierra Club modeled $SO_2$ emissions from units 4, 5, and 6 as follows:

| Source | XUTM (m) | YUTM (m) | THT (m) | Q (g/s) | Q (lb/hr) | HS (m) | TS (K) | VS (m/s) | DS (m) |
|---|---|---|---|---|---|---|---|---|---|
| Unit 4 | 293097.8 | 3959945.8 | 156.21 | 828.576 | 6576.00 | 106.68 | 402.04 | 17.13 | 7.32 |
| Unit 5 | 293152.3 | 3959955.7 | 156.76 | 828.576 | 6576.00 | 106.68 | 402.04 | 17.13 | 7.32 |
| Unit 6 | 293225.2 | 3959976.2 | 156.95 | 828.576 | 6576.00 | 152.40 | 402.04 | 24.84 | 6.55 |

The $SO_2$ emission rates are based on permitted emission limits of 1.2 lb/MMBTU, and a boiler heat input of 5,480 MMBTU/hr for each unit.[63] Sierra Club obtained UTM source coordinates using ESRI's ArcGIS geographic information system and NAIP orthoimagery. Stack parameters for units 4, 5, and 6 were developed using USEPA's Non-Hg Case Study Chronic Inhalation Risk Assessment for the Utility MACT, which included AERMOD modeling for all three of OG&E's Muskogee coal-fired units.[64] Unit 6, which ODEQ determined is not BART-eligible, was not included in the BART modeling analysis. It is, however, a NAAQS-consuming source that must be included in any one-hour $SO_2$ NAAQS compliance modeling.

Sierra Club modeled OG&E Muskogee's $SO_2$ emissions using 2005 through 2009 surface ISHD and one-minute ASOS data from Muskogee, OK, as described above. Sierra Club used 2005 through 2009 FSL upper-air data from Norman, OK in Sierra Club AERMOD modeling analysis of this facility.

Sierra Club did not have detailed OG&E Muskogee plot plans which would provide building dimensions and locations. Using oblique GIS orthoimagery and elevation photos, it appears that building downwash may be a factor for the Muskogee facility. Using available images, we developed estimated inputs for USEPA's Building Profile Input Program for PRIME (BPIPPRM), a program that calculates projected building dimensions for AERMOD's downwash algorithms.

For this scenario, units 4, 5, and 6, with building downwash, OG&E Muskogee's $SO_2$ emissions result in a 1,158.5 $\mu g/m^3$ five-year average fourth-highest daily maximum one-hour $SO_2$ concentration. This is a violation of the one-hour $SO_2$ NAAQS, which

---

[63] ODEQ, Air Quality Division, Permit Memorandum, Evaluation of Permit Application No. 97-136-TV (M-4), Oklahoma Gas and Electric Muskogee Generating Station, June 16, 2006. See also, ODEQ, Air Quality Division, BART Application Analysis, Oklahoma Gas and Electric Muskogee Generating Station, January 15, 2010, p. 2.

[64] USEPA, Non-Hg Case Study Chronic Inhalation Risk Assessment for the Utility MACT, Appropriate and Necessary Analysis, March 16, 2011, p. 6.

occurs solely due to emissions from OG&E's Muskogee three coal-fired units. These results are summarized in the following table.

| H4H Conc. ($\mu g/m^3$) | One-Hour $SO_2$ NAAQS ($\mu g/m^3$) | XUTM (m) | YUTM (m) |
|---|---|---|---|
| 1158.51 | 196.50 | 293450 | 3960950 |

As a sensitivity analysis, Sierra Club modeled OG&E's Muskogee coal-fired units 4 and 5 with downwash inputs to AERMOD. For this scenario, OG&E Muskogee's $SO_2$ emissions result in a 1086.0 $\mu g/m^3$ five-year average fourth-highest daily maximum one-hour $SO_2$ concentration. While Sierra Club believes this is a significantly under-predicted modeled air impact, it demonstrates that OG&E's Muskogee BART-eligible units 4 and 5 are violating the one-hour $SO_2$ NAAQS. As before, these impacts occur solely due to $SO_2$ emissions from OG&E's Muskogee facility (and without emissions from unit 6). These results are summarized in the following table.

| H4H Conc. ($\mu g/m^3$) | One-Hour $SO_2$ NAAQS ($\mu g/m^3$) | XUTM (m) | YUTM (m) |
|---|---|---|---|
| 1085.97 | 196.50 | 293400 | 3960800 |

As a further sensitivity analysis, we also modeled OG&E's Muskogee coal-fired units 4, 5, and 6 without any downwash inputs to AERMOD. For this scenario, OG&E Muskogee's $SO_2$ emissions result in a 534.6 $\mu g/m^3$ five-year average fourth-highest daily maximum one-hour $SO_2$ concentration. While Sierra Club believes this is a significantly under-predicted modeled air impact, it demonstrates that even without downwash inputs, OG&E's Muskogee units 4, 5, and 6 are violating the one-hour $SO_2$ NAAQS. As before, these impacts occur solely due to $SO_2$ emissions from OG&E's Muskogee facility. These results are summarized in the following table.

| H4H Conc. ($\mu g/m^3$) | One-Hour $SO_2$ NAAQS ($\mu g/m^3$) | XUTM (m) | YUTM (m) |
|---|---|---|---|
| 534.55 | 196.50 | 291200 | 3956600 |

### The OG&E Sooner Facility is Causing Violations of the One-Hour $SO_2$ NAAQS

Sierra Club prepared a one-hour $SO_2$ NAAQS compliance modeling analysis of OG&E's Sooner facility $SO_2$ emissions. Sierra Club modeled $SO_2$ emissions from units 1 and 2 as follows:

- 25 -

| Source | XUTM (m) | YUTM (m) | THT (m) | Q (g/s) | Q (lb/hr) | HS (m) | TS (K) | VS (m/s) | DS (m) |
|--------|----------|----------|---------|---------|-----------|--------|--------|----------|--------|
| Unit 1 | 674574 | 4036110 | 286.15 | 773.539 | 6139.20 | 152.44 | 430.78 | 34.12 | 6.10 |
| Unit 2 | 674500 | 4036141 | 286.36 | 773.539 | 6139.20 | 152.44 | 430.78 | 34.12 | 6.10 |

The $SO_2$ emission rates are based on permitted emission limits of 1.2 lb/MMBTU, and a boiler heat input of 5,116 MMBTU/hr for each unit.[65] Sierra Club obtained UTM source coordinates using ESRI's ArcGIS geographic information system and NAIP orthoimagery. Stack parameters for units 1 and 2 were developed using USEPA's CALPUFF BART visibility improvement modeling input files.

Sierra Club modeled OG&E Sooner's $SO_2$ emissions using 2005 through 2009 surface ISHD and one-minute ASOS data from Stillwater, OK, as described above. Sierra Club used 2005 through 2009 FSL upper-air data from Lamont, OK in our AERMOD modeling analysis of this facility.

Sierra Club did not have detailed OG&E Sooner plot plans which would provide building dimensions and locations. Using oblique GIS orthoimagery and elevation photos, it appeared that building downwash may be a factor for the Sooner facility. Using available images, we developed estimated inputs for USEPA's Building Profile Input Program for PRIME (BPIPPRM), a program that calculates projected building dimensions for AERMOD's downwash algorithms. Our modeling analysis with estimated building dimensions, however, found equivalent results with both estimated downwash and no-downwash modeling scenarios.

For this scenario, OG&E Sooner units 1 & 2 $SO_2$ emissions result in a 199.1 µg/m$^3$ five-year average fourth-highest daily maximum one-hour $SO_2$ concentration. This is a violation of the one-hour $SO_2$ NAAQS, which occurs solely due to emissions from OG&E's Sooner coal-fired units. These results are summarized in the following table.

| H4H Conc. (µg/m$^3$) | One-Hour $SO_2$ NAAQS (µg/m$^3$) | XUTM (m) | YUTM (m) |
|----------------------|----------------------------------|----------|----------|
| 199.08 | 196.50 | 672400 | 4038900 |

---

[65] ODEQ, Air Quality Division, Permit Memorandum, Evaluation of Permit Application No. 2003-274-TVR, Oklahoma Gas and Electric Sooner Generating Station, February 7, 2006. See also, ODEQ, Air Quality Division, BART Application Analysis, Oklahoma Gas and Electric Sooner Generating Station, January 15, 2010, p. 2.

**The AEP/PSO Northeastern Facility is Causing Violations of the One-Hour SO$_2$ NAAQS**

Sierra Club prepared a one-hour SO$_2$ NAAQS compliance modeling analysis of AEP/PSO Northeastern facility SO$_2$ emissions. We modeled SO$_2$ emissions from units 3 and 4 as follows:

| Source | XUTM (m) | YUTM (m) | THT (m) | Q (g/s) | Q (lb/hr) | HS (m) | TS (K) | VS (m/s) | DS (m) |
|--------|----------|----------|---------|---------|-----------|--------|--------|----------|--------|
| Unit 3 | 257863 | 4035131 | 195.21 | 878.774 | 6974.40 | 183.00 | 424.00 | 18.97 | 8.23 |
| Unit 4 | 257863 | 4035162 | 195.42 | 845.813 | 6712.80 | 183.00 | 415.00 | 17.46 | 8.23 |

The SO$_2$ emission rates are based on permitted emission limits of 1.2 lb/MMBTU, and a boiler heat input of 5,812 MMBTU/hr for unit 3 and 5,594 MMBTU/hr for unit 4.[66] We obtained UTM source coordinates using ESRI's ArcGIS geographic information system and NAIP orthoimagery. Stack parameters for units 3 and 4 were developed using USEPA's CALPUFF BART visibility improvement modeling input files.

Sierra Club modeled AEP/PSO Northeastern's SO$_2$ emissions using 2005 through 2009 surface ISHD and one-minute ASOS data from Tulsa, OK, as described above. Sierra Club used 2005 through 2009 FSL upper-air data from Norman, OK in Sierra Club's AERMOD modeling analysis of this facility.

Sierra Club did not have detailed AEP/PSO Northeastern plot plans which would provide building dimensions and locations. Using oblique GIS orthoimagery and elevation photos, it does not appear likely that building downwash is a factor for the Northeastern facility. Thus, Sierra Club's modeling analysis did not include building downwash inputs for this facility.

For this scenario, AEP/PSO Northeastern 3 & 4 SO$_2$ emissions result in a 259.3 µg/m$^3$ five-year average fourth-highest daily maximum one-hour SO$_2$ concentration. This is a violation of the one-hour SO$_2$ NAAQS, which occurs solely due to emissions from AEP/PSO Northeastern's coal-fired units. These results are summarized in the following table.

---

[66] ODEQ, Air Quality Division, Permit Memorandum, Administrative Amendment to Permit No. 2003-410-TVR (M-2), American Electric Power, Public Service Company of Oklahoma, Northeastern Power Station, August 9, 2010. See also, ODEQ, Air Quality Division, BART Application Analysis, AEP-Public Service Company of Oklahoma, Northeastern Power Plant, January 19, 2010, p. 2.

| H4H Conc. ($\mu g/m^3$) | One-Hour SO$_2$ NAAQS ($\mu g/m^3$) | XUTM (m) | YUTM (m) |
|---|---|---|---|
| 259.31 | 196.50 | 254550 | 4033400 |

### Nitrous Oxide (NOx) BART

Under these specific circumstances, Sierra Club supports EPA's determination that low-NOx burners are appropriate as BART.  In most cases, we support BART limits that reflect the use of Selective Catalytic Reduction ("SCR") and a .035 lbs/MMBTU limit. Here, EPA proposes to accept Oklahoma's BART emission limit of .15 lbs/MMBTU based on what can be achieved with low-NOx burners ("LNBs") with overfire air ("OFAs"). Low-Nox burners with OFA controls can achieve roughly 50-70% NOx reduction, compared with 90% reduction that SCR can achieve.  However, in this case, both Oklahoma and EPA found that the additional visibility benefits from SCR are not justified by the additional cost of that control.[67]

EPA's proposed NOx emissions limit meets the BART presumptive limit; however, we note that presumptive BART limits are intended as guideposts, not de facto standards suitable for adoption by all BART-eligible sources.  EPA's BART guidelines include presumptive BART emission limits for EGUs which were based on EPA's broad review of the control technologies and emission limits that could be met cost effectively at a wide range of coal-fired power plants. The presumptive BART limits developed by the previous administration did not consider impacts on visibility and were set at the least-stringent end of the range of potential limits. In addition, the cost thresholds used to support those limits were far below the costs generally accepted in Best Available Control Technology Analyses.

In most cases, Sierra Club supports BART limits that reflect the use of SCR and a .035 lbs/MMBTU limit.   SCR technologies are the industry standard and EPA recognizes that they "are routinely designed and have routinely achieved a NOx control efficiency of 90%."[68]  The EPA recently proposed a NOx limit of 0.05 lbs/mmbtu for the San Juan Generating Station in New Mexico, but this limit was based on 83% instead of the well-accepted 90% removal efficiency.

For example, in Sierra Club's comments on the San Juan Generating Station, Sierra Club submitted a technical basis, including support from major catalyst vendors, to show that 90% removal efficiency is feasible and should be required.  Sierra Club also provided evidence showing that an emission rate of 0.035 lbs/mmbtu is being achieved at other units, even without a permit limit requiring it. Furthermore, in three years (when SJGS will be required to meet the new limit under EPA's proposal), SCR technology will

---

[67] EPA's Technical Support document, page 42.
[68] See, e.g., EPA's Technical Support Document for San Juan Generating Station at p. 30.

- 28 -

improve to even greater levels of efficiency than exist today, thereby making a limit of 0.035lb/mmbtu not only reasonable, but also a modest standard.[69]

## **Particulate Matter (PM)  BART**

Under these specific circumstances, Sierra Club supports EPA's determination that existing Electrostatic Precipators ("ESPs") and a 0.1lbs/MMBTU emissions limit is appropriate as BART for particulate matter.  In most cases, we support fabric filters and baghouses for PM control and an emissions limit of at least 0.015 lb/MMBTU.  Arizona's proposed regional haze SIP includes this BART emissions limit for Cholla Units 2, 3 and 4.[70]  EPA required as BACT at the Desert Rock facility a 0.010 lb/MMBtu emissions limit, along with an opacity limit no higher than 10% to show continuous compliance with the particulate matter BART limits.[71]

Here, EPA proposes to accept Oklahoma's BART emission limit of 0.1 lbs/MMBTU based on what can be achieved with existing ESPs.  Fabric filters (or baghouses) can achieve better control than ESPs, however, in this case, both Oklahoma and EPA found that the additional visibility benefits are not justified by the additional cost of that control.[72]

Installing baghouses would also achieve better $SO_2$ controls. The addition of a baghouse will improve $SO_2$ removal efficiency because of less pluggage of particulate in the scrubber and improved liquid-to-gas contact.

The forthcoming Maximum Achievable Control Technology ("MACT") standards for electrical generating steam generating units ("EGUs") will likely require baghouses for the units at issue.[73] The Oklahoma units would be subject to a mercury emission limit of 0.008 lb/GWh.[74]  EPA's Toxic Release Inventory provides that Sooner's mercury emissions for 2009 were 0.031lbs/GWh; Muskogee 0.031 lbs/GWh; and Northeastern 0.029 lbs/GWh.[75]  To achieve a 0.008 lb/GWh emissions rate, the plants will require a new PM control in order to lower their emissions by more than 30%. It is well known that coal-fired boilers equipped with baghouses achieve better control of mercury than those equipped with ESPs.  Mercury control at bituminous coal-fired

---

[69]  See San Juan Citizens Alliance et al. Comments to EPA on EPA Docket No. EPA-R06-OAR-2010-0846 (Apr. 4, 2011).

[70]  Arizona DEQ, Plans, Regional Haze and Visibility, Cholla BART analysis (Jan. 2008), *available at* http://www.azdeq.gov/environ/air/haze/index.html

[71]  See 75 Fed.Reg. 64221, 64223 (October 19, 2010).

[72]  *E.g.,* EPA's Technical Support document, page 42.

[73]  76 Fed. Reg. 24976, available at http://www.epa.gov/ttn/atw/utility/utilitypg.html

[74]  76 Fed. Reg. 24976, 25127, TABLE 2 TO SUBPART UUUUU OF PART 63.  Powder River Basin coal, which is the type of coal burned at these units, typically has a heat value in excess of 8300 Btu/lb.

[75]  TRI: http://www.epa.gov/tri/
EIA: http://www.eia.doe.gov/cneaf/electricity/page/eia423.html
Formula: lbs Hg/(net generation (mwh)/1000).

boilers with a cold-side ESP and a wet scrubber averaged 81% as compared to 98% control achieved with a baghouse and wet scrubber.[76]

Updated PM controls may also be necessary at the Oklahoma units to meet EPA's proposed PM limit for non-mercury metal hazardous air pollutants ("HAPs"). EPA assumed many coal-fired power plants would need to be retrofitted with baghouses to meet the total PM limit in its regulatory impact analysis for the proposed MACT rule.[77] The compliance timeframe of the EGU MACT rule will be similar to BART. EPA is required to finalize its EGU MACT rule by November 16, 2011. Under the proposed MACT rule (and as required by the Clean Air Act), existing sources will be required to comply with the MACT rule within three years of promulgation – or by approximately the end of 2014 which is about the same timeframe that would be required to meet BART requirements.

### Ammonia and Sulfuric Acid Mist Bart

Sierra Club requests that EPA set emission limits for ammonia similar to those proposed for the San Juan Generating Station BART rulemaking.[78] Ammonia emissions are important because they react with $SO_2$ and NOx to form ammonium sulfate and ammonium nitrate particles, which are very effective in impairing visibility. States must exercise "best judgment to determine whether VOC or ammonia emissions from a source are likely to have an impact on visibility in the area." 70 FR 39162. Thus, Sierra Club requests that EPA set the ammonia emission limit at a rate no higher than the 2.0 parts per million as proposed at San Juan. We also support requiring installation of CEMs to monitor this pollutant.

Sierra Club also requests that EPA set an emission limit for sulfuric acid mist, as it proposed as part of the San Juan Generating Station BART rulemaking.[79] Sierra Club urges EPA to set an emission rate no higher than the 1.06 x 10-4 lb/MMBtu for each unit as proposed at San Juan. Sierra Club agrees that this rate is supportable based on use of low reactivity catalyst and the most current information from the Electric Power Research Institute. If continuous emission monitors are technically infeasible for this pollutant, we also urge EPA to require stack test monitoring on a more frequent basis than annual monitoring. EPA should clarify whether the set emission limit is required under the regional haze program as part of a BART determination for the facility, and must be complied with within 3 years of the date of the final rule.

---

[76] US EPA, Performance and Cost of Mercury and Multi-Pollutant Emission Control Technology Applications on Electric Utility Boilers, EPA-600/R03-110 (October 2003) at 7.
[77] EPA, Regulatory Impact Analysis of the Proposed Toxics Rule, available at http://www.epa.gov/ttn/atw/utility/utilitypg.html
[78] 76 Fed.Reg. 503-4 (January 5, 2011).
[79] 76 Fed.Reg. 503-4 (January 5, 2011).

**Conclusion**

Thank you for the opportunity to submit comments on EPA's proposed regional haze FIP for Oklahoma.  Please consider all comments for the final rule.  As described above, Sierra Club typically finds that wet scrubbers constitute BART for sulfur dioxide, selective catalytic reduction for nitrous oxides, and baghouses for particulate matter.  However, under these particular circumstances, Sierra Club supports EPA's proposed FIP requiring dry scrubbers, low-NOx burners with OFA, and Electrostatic Precipators.

We ask that EPA approve the proposed FIP and provide Oklahoma with compliance options of: installing dry scrubbers within three years; switching to gas; or, decommissioning units within five years.

Sincerely,

Andrea Issod
Gloria D. Smith
Sierra Club Environmental Law Program
85 Second Street, 2d Floor
San Francisco, CA 94105-3441
Phone: (415) 977-5544
Fax: (415) 977-5793
andrea.issod@sierraclub.org
gloria.smith@sierraclub.org

On behalf of Sierra Club and WildEarth Guardians